Stikes, Adm'r, v. Swanson et al.

---

## STIKES, Adm'r, *vs.* SWANSON et al.

[APPEAL FROM ORDER OF DISTRIBUTION OF DECEDENT'S ESTATE—SLAVE MARRIAGES.]

1. *Slaves, marriages between, during slavery; legal effect of.*—The marriages of slaves and of freedmen of color with slave women during the existence of slavery in this State, were not illicit connections, but were legal *quasi* marriages, such as the laws allowed and the church approved.
2. *Same; children of, not bastards.*—The children of such marriages were not bastards at common law, and there is no law of this State which made them bastards. Upon the emancipation of the children of such marriages, by the results of the late war, and the elevation of these persons to citizenship of this State, their heritable blood was restored, the impediment of slavery which obstructed it before, being thus removed.
3. *Same; when such children are entitled to inherit the estate of freedman who died in* 1860.—Such children are entitled to inherit the estate of their father, who died a freedman in this State in the year 1860, when his estate remained in the hands of his administrator up to the date of their emancipation, and was then unclaimed by the State.

APPEAL from the Probate Court of Mobile.
Tried before Hon. G. HORTON.

This is an appeal from a decree of the probate court of
41

Mobile county, distributing the estate of Cassius Swanson, deceased, who was a freedman of color.

The facts, upon which the court below acted, were agreed upon by the parties litigant. They were briefly these: Cassius Swanson was originally a slave in the State of Florida; he was there emancipated and set free, under the laws of that State, and removed to the city of Mobile in this State, shortly after his emancipation in Florida, and settled at Mobile as a resident inhabitant of this State. After settling there, he died intestate in Mobile county, in this State, leaving considerable estate, consisting of slaves and other property, which seems to have been altogether personal property. Upon Swanson's death, Augustus Stikes became the administrator of his estate in said county of Mobile. Swanson died some time in 1860, and letters of administration on his estate were granted to Stikes on the 13th day of August, 1860. On the 10th day of December, 1868, Stikes made final settlement of his administration of Swanson's estate, when it was found that there remained in his hands, unexpended, the sum of $556 18 for distribution amongst those persons entitled to the same. This fund was claimed by Martin, Abraham, and William, who were the sons of Cassius Swanson, deceased; but they were children by two mothers; Martin by one mother, and Abraham and William by another. These mothers were both slave women at the birth of these children; the mother of Martin remained a slave till her death, which occurred before 1859. After the death of Martin's mother, who died a slave, Cassius married a second wife, who was also a slave, and by her he had the children Abraham and William. Martin, Abraham and William were all born slaves, but became free by the result of the late war. The mother of Abraham and William was also made free in the same way; it does not appear whether this latter woman is yet living or not. Cassius Swanson always acknowledged and recognized the mothers of his children aforesaid, as his wives, so long as he and they lived. He did not marry the second wife until after the first wife was dead; and he was a slave himself when he was married to each. He treated and acknowledged

both these women as his wives while he lived. It does not appear that the second wife of said Cassius Swanson had any notice of the proceedings in the court below, or that she was in any manner made a party to the same.

Upon this State of facts the honorable judge of probate of Mobile county, decreed an equal distribution of the funds in the hands of the administrator, Stikes, to the three sons of Cassius Swanson, deceased, to-wit: the said Martin, the said Abraham, and the said William, in share and share alike, and decreed the same to be paid over to each of them accordingly, by said administrator.

From this decree the administrator appeals to this court, and assigns the action of the court below for error.

BOYLES & OVERALL, for appellant.

B. LABUZAN, contra.

PETERS, J., (after stating the facts above).—The cohabitation of Cassius Swanson with each of his two wives, was undoubtedly a *quasi* marriage. He did all that he could do to make it legal. The impediment which prevented its legality was the slavery of the parties. This was an impediment not known at common law, and could not exist at common law, because it was not permitted by that code of jurisprudence. The cohabitation was not adulterous; it was permitted, if not encouraged by the laws of all the States where such connections existed. It was then certainly a legal *quasi* marriage. The parties had done all within their power to make these marriages complete and legal. Slavery out of the way, they would have been legal at common law. Certainly the parties intended to marry, and did all that they were able to do to carry this intention into effect; they were then legal slave marriages.—Cobb on Slavery, p. 231, § 253 ; *The State v. Samuel*, 2 Dev. & Batt. 17 *l* ; *The State v. Ben*, 1 Hawks, 434 ; *Chamberlain v. Harvey*, Ld. Raym. 146, S. C., Carth. 397 ; *Smith v. Gould*, Ld. Raym. 1274 ; *Forbes v. Cochrane*, 2 Barn. & C. 448 ; 2 Kent 86, 87, and notes; 2 *Ib.* 246, 247, *et seq.* ; 1 Bla. Com. 423 ; 1 Bish. M. & Div. p. 2, *et seq.* ; 6 Bac. Abr. Bouv., p. 454 ; 2 Pars. on Contr., p. 60 *et seq.*

Marriage is undoubtedly a natural right, and slavery did not deprive the man in this condition of all his natural rights. So far as was consistent with his *status*, these were allowed. In the distribution of slaves by administrators, the marital rights of the slave, as far as possible, were respected. They were usually allotted by families. They were usually sold when this could be done, in the same manner. The slave might to a certain extent defend himself. These were not mere regulations of humanity; they were permitted in some instances to be enforced as law. Infidelity between the married parties was regarded by the master as a moral offense, punishable with stripes, and by the church as an infraction of the creed.—*Dave v. The State*, 22 Ala. 23; *The State v. Will*, 1 Dev. & Batt. 171; *The State v. Cæsar*, 9 Ired. 391; 2 Pars. Contr., p. 74; § 4; Ruthf. Inst., p. 162; Shelf Mar. & Div., p. 1, *et seq; Wall v. Williamson*, 8 Ala. 48; *Wall v. Williams, use, &c.*, 11 Ala. 826; *Linds v. Belisario*, 1 Hag. Com. 214; 4 Eng. Ec. 367, 374.

I refer to these authorities to show that the marriages of Cassius Swanson as above stated, were marriages good at common law; that they were legal natural marriages, *jure divino*. They were not then mere adulteries or fornications, nor were the cohabitations for any illegal or improper purpose. Then the offspring of such marriages could not be bastards at common law. They had, in their condition, a legal mother, and they had a legal father, united in such marriage as the law allowed them to contract, which were not unfrequently blessed with the sanction and prayers of the church. They were then undoubtedly legal *quasi* marriages. The unhappy condition of the parties only intervened to prevent these marriages from being perfect in the highest legal sense. The children, then, were not bastards, unless the law makes them bastards; they were not born of an illicit connection; they were not begotten and born out of lawful wedlock. Then, they were not bastards.—2 Kent, 208, 210; 2 Bac. Abr. Bouv., p. 77. They were undoubtedly born within marriages which were legitimate. All children born within such marriages are legitimate. This brings them within

the description of the statute, and the equity of the statute; and also within the policy of the law of the State.—Rev. Code, § 1888.

The former decisions in this State upon the question of slave marriages were made in the interest of slavery. This interest is now overturned, and these cases deserve but little weight.—*Smith v. The State*, 9 Ala. 990; *Malinda & Sarah v. Gardner*, 24 Ala. 719.

Emancipation has restored the former slave to his natural rights. The reason of the old cases is overturned, and the constructions upon which they rested fail to do justice to the citizen. This of itself is a sufficient reason to abandon them. Justice is the law of laws, and these decisions now militate against justice; they are abrogated. *Jus est norma recti; et quicquid est contra normam recti est injuria.*—3 Bulstr. 313; Const. of Ala. 1867, Art. 1, § 15. The unfortunate claimants of the proceeds of their father's toil, should not be made to suffer for a wrong committed, against their mothers, their father and themselves. This would be adding wrong to wrong, without any necessity to vindicate it, except, perhaps, an old prejudice, the basis of which is now swept away forever.—Cons. U. S., Amendm. 13, 14; Acts of Cong., April 9, 1866; Civil Rights Bill; Stat. at Large, 1865, 1866, ch. 31, p. 271.

Then, the appellees are not bastards, and emancipation has restored their heritable blood.—*Gerod v. Lewis*, 6 Mart. (La.) 559. They are the children of a freedman themselves restored to liberty, and as such entitled to inherit his estate.—Rev. Code, §§ 1888, 1897, 1894; Ordn. Conv. 1867, No. 23; Pamph. Acts 1868, p. 175. They are of the whole blood of the father, and the estate comes through him, and each is entitled to a full share of his estate.—Rev. Code, § 1892; *Johnson v. Copeland's Adm'r*, 35 Ala. 521.

The judgment of the court below is affirmed. The appellant will pay the cost in this court and in the court below, to be repaid him out of the estate of said Cassius Swanson in his hands to be administered.