## KINNEY PRICE *v.* ANN SLAUGHTER ET AL.

Where an action is brought for the recovery of lands situated in Ohio, by the plaintiff, who was a slave in Tennessee when the cause of action accrued, and the defendant pleaded the statute of limitations:

*Held*, that slavery was a disability by imprisonment, and that the statute of limitations began to run only when that disability was removed.

Where the plaintiff and cross-petitioners were slaves: *Held*, that no comity

now required a recognition and enforcement by this court of the laws of slave States, which made all slave children illegitimate, and so prevented collateral inheritance among slaves.

*C. B. Simrall* and *L. H. Swormstedt,* for plaintiff.

*H. Snow* and *James S. White,* for Ann Slaughter.

*H. P. Lloyd* and *Tafel & Throop,* for cross-petitioners.

Points made by *C. B. Simrall,* plaintiff's attorney:

1. The property in litigation being within this State, the Ohio laws of descent and distribution must govern in determining who are the heirs or legal representatives.

2. Slavery is such imprisonment as will estop the statute of limitation from running against the plaintiff. Angell on Limitation, sec. 192; *Matilda* v. *Crenshaw,* 4 Yerg. (Tenn.) 299.

3. Slavery, existing under the common law, must be governed by the common law, which permitted " *all persons* to contract marriage except those forbid by canonical laws, prior marriage, want of age, or want of reason." Blackstone, vol. I., pp. 433–439. The term " all persons " includes slaves, whose ability to contract marriage could be destroyed only by legislative enactments.

4. Slavery being a violation of the Ohio constitution (see Ohio Constitution, sec. 6), and against the equity and policy of Ohio laws, the courts of Ohio can not take cognizance of slavery existing in another State, except so far as they were compelled by the Federal compact respecting fugitive slaves.

5. Legitimacy is always presumed; bastardy must be proved.

6. Isham Slaughter, in his will, refers to plaintiff and others as his "brothers and sisters in slavery," and leaves the residue of his property to his "right heirs." The recognition of plaintiffs and cross-petitioners as his brothers and sisters, is a sufficient description to allow them to take under a devise to "right heirs," the laws of Ohio for 1835 having

made the brothers and sisters of an intestate his heirs. Redfield on Wills, part 2, p. 346, *et seq.;* Jarman on Wills, pp. 327, 328.

7. A negro, after he attains freedom, may sue for and recover legacies left to him while he was a slave. *Nelson* v. *Smithpeter*, 2 Coldwell (Tenn.) 13; *Banks* v. *Banks*, 2 Coldwell (Tenn.) 546.

Grounds of demurrer made by *H. Snow*, for defendant:

1. Statute of limitations, (not insisted upon in the argument.)

2. Incapacity of slaves to inherit. 5 Cowen, 397; 1 Harris & McHenry, 561; 4 Desaussure (S. C.) 266; 2 Bl. Com. 249.

3. Offspring of slave marriages not legitimate, and, therefore, incapable of inheriting from one another. 1 Bishop on Marriage and Divorce, secs. 154–163; 2 Kent's Com. 253; Story on Conflict of Laws, secs. 79–113.

TAFT, J. This was an action to recover property situated in Cincinnati, viz: half of lot No. 24, in Ramsay's subdivision, and also lots 25 and 26, in the same subdivision. The petition alleges that the defendant, ever since September 1, 1849, has unlawfully kept the plaintiff out of the possession of said premises. The plaintiff also alleges that the defendant was, in the meantime, receiving large sums from the rents and profits, for which he asks an account. The plaintiff further says that from the time of the accruing of the action until January 1, 1863, he was a slave, held in duress in the State of Tennessee, and unable to bring any action, and asks judgment for the land, and mean profits.

Ann Slaughter, the defendant, demurs to the petition.

There are several persons who have filed cross-petitions, claiming to be brothers and sisters of the plaintiff and of Isham Slaughter, and as such to be entitled to undivided interests in said property as heirs of said Isham Slaughter, deceased, and setting forth the disability of slavery as an excuse for not sooner commencing the action. The cross-petition-

ers, as tenants in common of the plaintiff, would, in the ordinary course of pleadings in such cases, make themselves co-plaintiffs instead of defendants. The several interests of tenants in common in land are distinct interests, although to be enjoyed in common. But in the present case the plaintiff having claimed all the same interest which these cross-petitioners claim, it is not irregular or improper that they should appear on the record as claiming adverse interests by cross-petitions. If it were not so, and their claims did not conflict, the court would allow an amendment by which these cross-petitions should be co-petitions with the plaintiff.

The defendant, Ann Slaughter, demurs to both the petition and the cross-petitions, upon the ground that their right in the property has been barred by the statute of limitations, more than twenty-one years having elapsed since the death of Isham Slaughter, previous to the commencement of this suit.

But the petitioner and cross-petitioners anticipated the objection, and answered it by alleging that they were under duress as slaves in Tennessee. This we think a sufficient answer to the suggestion of the statute of limitations.

Angel on Limitations, sec. 192, lays down the doctrine that slavery is a disability by imprisonment, and prevents the running of the statute of limitations. It would be a singular instance of legal inhumanity if it did not have that effect. The same doctrine is announced in Tennessee. *Matilda* v. *Crenshaw*, 4 Yerger, 299.

The next point made by counsel for the defendant, Ann Slaughter, is that the plaintiff and these cross-plaintiffs appear, by their pleadings, all to have been slaves, and so not able to inherit from Isham Slaughter, their brother, or from each other; that all the children of slaves were illegitimate by the laws of the slave States, and that consequently there could be no collateral inheritance among slaves, as there could be no legitimate brothers and sisters.

The land lies in the State of Ohio, which has never recognized slavery as a legal condition, although under the con-

stitution of the United States it was provided that, "No person held to service or labor in one State, under the laws thereof, escaping into another, should, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be due." The State did, by statute, acknowledge its duty under this clause of the Federal constitution to allow "any person held to service in another State under the laws thereof, escaping into Ohio," to be reclaimed. This provision applies to apprentices as well as to slaves, and can not be considered as committing the State to the upholding all the legal consequences of slavery as recognized in the slave States. *Anderson* v. *Poindexter,* 6 Ohio St. 622; *Commonwealth* v. *Ares,* 18 Pick. Story's Con., sec. 96, 104. If the slave was permitted by the master to came into this State, the law of this State did not recognize his condition as that of a slave, but regarded him as a free man. We think that the law of Ohio has never taken cognizance of the legal condition of slavery beyond the simple constitutional idea that service might be due from one person to another by the laws of another State, and if so, to the extent only of allowing such person escaping into Ohio to be reclaimed.

Taking these pleadings as they stand, they show that the petitioner and the cross-petitioners were slaves, and under actual duress, but they show that these parties were brothers and sisters of Isham Slaughter. This court will not presume that these brothers and sisters are illegitimate, and so not entitled to the legal rights of brothers and sisters under the laws of descent. We find nothing in the pleadings to warrant any such presumption. Such a state of the law in Tennessee or in Kentucky, as is claimed by the defendant, Ann Slaughter, must be pleaded before this court can take cognizance of it.

Without reference, therefore, to the will, which was read and commented on at the argument, we hold that the demurrers must be overruled.

But if it should appear that the parents of Isham Slaughter and his five brothers and sisters lived together as husband and wife, and were so reputed, and these were their children, we should not feel bound to recognize or give effect to any part of the slave code which would make these children illegitimate.

An elaborate argument, with a citation of authorities, was offered to show that the marriage of slaves might be legal and valid; but we do not find any difficulty on this question as the pleadings stand. Legitimacy will be presumed until the contrary is shown. The marriage of the parents would be presumed to have been valid. It was held, in *Stikes* v. *Swanson*, 44 Ala. 633, where the estate of a freedman was to be distributed, who had been a slave in Florida and afterward removed to Mobile, where he had died, and where cohabitation with his wife was all the evidence which could be produced of their marriage; that at common law a valid marriage would be presumed but for slavery, and that the offspring of such a marriage could not be bastards; that the former decisions were made in the interest of slavery; that the state of the law had changed, and emancipation had now restored to them inheritable blood, and that the estate was distributable to the wife and children as legitimate. 1 Bish. on Marriage, 236–238; Schouler on Dom. Relations, 44, 45; Reeves, 310, 311. And no comity requires us now to recognize or enforce the laws of slavery. *Collins* v. *America,* 9 B. Mon. 572; *Anderson* v. *Poindexter,* 6 Ohio St. 622; Story's Confl., sec. 104; 44 Ala. 633.

It is not strictly necessary that we should consider the effect of the will, which is not before us, but the construction of which was contested in argument by consent of parties. But that will was made here in Ohio, where the land was situated; and it follows, from what we have already said, that these brothers and sisters would, in our opinion, answer the description of the right heirs of Isham Slaughter, to whom the will gives the property.