# Haden *v.* Ivey.

*Bill in Equity to enforce Trust in Lands, and obtain Legal Title.*

1. *Presumption as to common law in another state.* — In the absence of proof to the contrary, the common law on the subject of marriage will be presumed to have prevailed in South Carolina forty years ago, and to have applied to a marriage between a free man of color and a woman of mixed blood, whom he had bought as a slave, and with whom he cohabited as his wife.

2. *Validity of marriage between persons of mixed blood.* — The courts of this State will now recognize as valid a marriage between a free man of color and a woman of mixed blood, whom he had bought as a slave, on proof that the parties lived together as man and wife for forty years, first in South Carolina, and afterwards in Alabama, and that the husband, on his death in 1860, recognized the relation in his will, and sought to protect and provide for the woman as his wife.

3. *Wife's separate estate; how created, and when protected against purchaser from husband's administrator.* — At common law, the wife might, with the consent of her husband, acquire a separate estate in her own earnings, or in gifts from her friends; and if the money so acquired, or money furnished for her by her husband, is invested in land, and the legal title taken in the name of another person, a court of equity will, after the death of the husband, enforce the trust against a purchaser from his administrator, and decree a divestiture of the legal title.

4. *Adverse possession, as between husband and wife and purchaser from husband's administrator.* — An administrator, who enters into the possession of land of which his intestate was possessed at the time of his death, has no other or greater title than the intestate had, and cannot convey any greater title to a purchaser at a sale made under an order of the probate court; and if the legal title was in another person, who bought it with funds belonging to the wife, or furnished by the husband for her, holding it for her, and asserting no title in himself, the purchaser cannot make out a title under the statute of limitations, by adding such possession to his own.

APPEAL from the Chancery Court at Montgomery.

Heard before the Hon. ADAM C. FELDER.

The bill in this case was filed on the 3d August, 1870, by Tempy Ivey, as the widow of John J. Ivey, deceased, against Wiley Haden and Joseph S. Downing; and sought to recover a tract of land, containing forty acres, which had been sold by the administrator of said Ivey, under an order of the probate court of said county, and bought at the sale by said Haden; also, a decree divesting the legal title to said land out of the defendants, and vesting it in the complainant, with an account of the rents and profits, and general relief. John J. Ivey was a free man of color, who removed from Sumter district, South Carolina, to Alabama, about the year 1830, bringing the complainant with him. The bill alleged, that the complainant never was a slave, and that her mother was a white woman; and in her deposition as a witness for herself, the complainant

[Haden v. Ivey.]

testified that "she does not know whether she was ever held as a slave or not, but has heard that she was a free born woman;" but there is no other proof whatever in the record, tending to show that she was the child of a white woman. The bill further alleged, that the complainant and said Ivey "commenced to live together about forty years ago, and lived together until the death of said Ivey, which occurred about ten years ago, but they were never married," while her testimony as a witness, on this point, is: "There was not any license, but there was a marriage ceremony, administered by a regularly ordained minister of the gospel; they were lawfully married." The bill alleged, also, that the complainant, prior to July, 1838, had acquired some money and other property; and that the defendant Downing, "at her request, and with her own means," purchased the land in controversy, taking the title from the United States government in his own name, because of her condition as a colored person; that neither Downing nor said Ivey ever set up any claim to the land, but both always recognized it as hers, and that she was continuously in possession of the land, exercising acts of ownership over it, from the time of the purchase, until she was dispossessed by the purchaser at the administrator's sale.

A decree *pro confesso* was taken against Downing. Haden filed an answer, denying that the complainant was the daughter of a white woman, and alleging that she was born a slave, and continued a slave until she was emancipated by the late war; admitting that she lived with said Ivey, for many years, as his wife, but denying that she had, or could have, in 1838, or prior thereto, any money or property of her own; denying that the land was bought by Downing with money belonging to the complainant, and alleging that the purchase was made with money furnished by said John J. Ivey; denying that the complainant had ever been in possession of the land, and alleging that he, and those under whom he claimed, had been in continuous adverse possession for ten years; and pleading as a bar the statute of limitations of ten years, and a decree of the probate court, rendered on the complainant's petition for dower in the lands of said John J. Ivey, adverse to her claim.

The evidence offered on the hearing by the complainant, in addition to her own deposition, was the deposition of said Joseph S. Downing, and the will of said John J. Ivey. Downing testified, in substance, as follows: "I have known the said Tempy Ivey ever since I can recollect. I was sixty years old last March. It has always been my understanding, that she was a slave, and that she belonged to my father, and that he sold her to John J. Ivey. I do not know anything about her freedom, nor about her mother; don't know whether she was

[Haden *v.* Ivey.]

white or black. I do not know anything about the marriage of said John J. and Tempy Ivey; they did live together, but I do not know how such cohabitation began, and know nothing of their marriage. I have heard John J. Ivey speak of Tempy as his wife, and my understanding has always been that he bought her for his wife, and he treated her as his wife. I entered the said lands originally from the government. I do not know whose money it was, but John J. and Tempy Ivey both said, at the time the money was handed to me, that it belonged to said Tempy, and that she wanted to buy it out in lands. I do not know what their intention was, but the money was handed to me as belonging to said Tempy. I never claimed the land. I do not know that said Tempy Ivey ever had possession of said land, but do know that one Cornelius Alford had possession of it as executor about two and a half years, and one H. W. Clarke had possession as executor about seven years, and G. W. Haden now holds possession as purchaser, and has had it, I think, about three years." In the will of said John J. Ivey, which was executed in February, 1860, and duly proved and admitted to record in Montgomery in the latter part of that year, he speaks of Tempy Ivey as his wife, for whom he has great regard, who has been a faithful helpmate to him in life, and has helped him to accumulate his property; bequeaths and devises the whole of his estate, with some inconsiderable exceptions, to Mrs. Martha H. Alford, the wife of C. T. Alford, in trust, and on the condition that, " out of the proceeds of said estate, or the principal if necessary," she will support and maintain Tempy in comfort, and allow her to live wherever she may choose, free from labor or control; and on the failure of Mrs. Alford to comply with this condition, or on her death without issue, Elisha Reynolds was to be substituted in her stead, and he, in like manner, was to be succeeded by said H. W. Clarke.

The defendant offered in evidence the depositions of James B. Downing, Winney Downing, Riner Ivey, and Kit Ivey. James B. Downing, who was the brother of Joseph S. Downing, testified that he had known Tempy as a child in South Carolina, and ever since; that she was a slave, and belonged to his father, who sold her to John J. Ivey about the year 1827; that she was, " to some extent, the wife of John J. Ivey, and slept and ate with him, though they were never, to the knowledge of witness, legally married." Winney Downing and Riner Ivey were slaves, who had belonged to said Joseph Downing, and testified, that they had known Tempy since she was a child; that she belonged to their master, and was sold by him to said John J. Ivey, who afterwards cohabited with her up to his death, but treated her otherwise as he did his

[Haden *v.* Ivey.]

other slaves. The testimony of Kit Ivey, who was a slave of John J. Ivey, was substantially the same.

On final hearing, on pleadings and proof, the chancellor held the complainant entitled to the relief prayed in her bill; and he therefore rendered a decree, requiring the defendant Downing to convey the land to her by quitclaim deed, ordering an account of the rents to be stated by the register, and imposing the costs on the defendant Haden, who now appeals from the decree, and here assigns it as error.

H. C. SEMPLE, for appellant.

STONE & CLOPTON, *contra.*

PETERS, C. J. — The reasons which support the legality of the marriage in *Stikes, adm'r,* v. *Swanson et al.* (44 Ala. 633), apply equally to the marriage insisted on in this case. Here, matrimonial cohabitation of John J. Ivey and Tempy Ivey is shown, by the preponderance of the evidence, for near forty years. And this *status* of these parties is also affirmed by all the circumstances of the case. John J. Ivey was a freedman, and Tempy Ivey lived with him as his wife, in this State, for many years before his death, openly and publicly, without offence to the law, or the morals of the community. The reasons for such an acquiescence tend strongly to show the legality of the cohabitation. Mrs. Ivey's testimony shows that there was an actual marriage, possibly consummated in the State of South Carolina. Certainly no one could have a better knowledge of this fact than she. Such marriages in that State were permitted to be loosely entered into ; and where it is not shown that there is a statute governing their celebration, it will be presumed that they are sufficient, if they have been contracted as at common law. The common law is presumed to prevail in those States of a common origin with our own, unless the contrary is shown. 1 Brick. Dig. p. 349, § 9, and cases there cited. Whether Mrs. Ivey is the child of a white woman and a colored man, or of a colored woman and a white man, may admit of some doubt. If she was the former, her *status* could not be changed by a sale which treated her as a slave. The sale did not affect her right to liberty. She was still free notwithstanding the sale. Ivey so treated her. He did not dispose of her in his will ; but he sought to protect her and provide for her, with unusual care. They were both persons of mixed blood, and in their unhappy condition they contracted and consummated such a marriage as the law then permitted. It was clearly such a marriage as would have been sufficient at common law. It was not wholly void. *Stikes,*

[Haden v. Ivey.]

*adm'r,* v. *Swanson et al.* (44 Ala. 633), and cases there cited. The preponderance of the proofs in this case is obviously in favor of a marriage at common law. This was enough to rescue the connection between persons occupying the *status* of freedmen and freedwomen, before emancipation, from the illegality of mere concubinage. And the public policy of the State since emancipation has been to give such marriages, as between the parties themselves, full validity. Ord. No. 23 of Conv. 1867; 44 Ala. 633, *supra.*

3. Then, the husband might permit the wife to use her own earnings, or gifts from her friends, for her own purposes, and invest the same in land. *Rivers* v. *Carlton et al.,* at June term, 1873; 2 Kent, 163; 3 P. Wms. 334; 31 Ala. 266. The evidence is free from rational doubt, that the money to pay for the land entered by Downing, and about which this controversy has arisen, was furnished by Mrs. Ivey, or by her husband and herself for her, and the land was entered by Downing in his own name for her use. In equity, this vested the title in her; and such a title a court of chancery will protect against a claim set up by the husband, or by those claiming under him, who do not claim as his creditors. 2 Story's Eq. §§ 1201 *et seq.; Lee* v. *Browder,* at the present term. From this it appears, that the title to the land in controversy never belonged to John J. Ivey, deceased, and consequently could not be sold by the representative of his estate. Only such title as was vested in the deceased could be sold by his administrator, and such title only did the purchaser at such sale acquire as was vested in the decedent. This is Haden's title, and as against Mrs. Ivey it is worthless. It is a judicial sale, and the purchaser must look to the title that he buys. 9 Ala. 297.

4. The demurrer was withdrawn. The assignment upon it is without support of the record. The plea of the statute of limitations is not sustained. Neither the deceased, nor his administrator, held the land in controversy under any color of right whatever. If the administrator occupied the lands at all, he did so as a trespasser, and he could not in such way acquire a title for the deceased, or any other person, save himself; and he sets up no title in himself.

The learned chancellor's view of the facts and the law, as shown by his decree, was correct. The judgment of the court below is, therefore, affirmed, with costs.