Scoggins vs. The State.

## SCOGGINS VS. THE STATE.

1. BIGAMY: *Limitation applicable to.*
   The offense of bigamy is barred by the lapse of three years from the date of the bigamous marriage.

2. ——: *Defined.*
   It is the marrying by a person who has a husband or wife living, that constitutes the offense of bigamy under our statute, and the offense is complete upon the second marriage ; subsequent cohabitation does not enter into it, or render it a continuing offense.

3. INDICTMENT: *In regard to allegations as to time when the offense charged is within the statute of limitations.*
   See the opinion.

4. MARRIAGE: *By cohabitation under special statute.*
   The provisions of the act of February 6th, 1867, providing that negroes and mulattoes then cohabiting as husband and wife, and recognizing that relation, should be deemed lawfully married.from the passage of the act, with the rights and obligations appertaining to the marital relation, was valid, and of its own force created that relation between such persons as were within its provisions, without the necessity of a marriage ceremony.

5. ——: *Evidence of by acts and admissions of the parties.*
   Evidence of cohabitation as husband and wife at and after the passage of the act, and the admissions of the parties, are competent to establish a marriage under the act.

APPEAL from *Howard* Circuit Court.

Hon. L. J. JOYNER, Circuit Judge.

*Attorney General* for the State.

ENGLISH, CH. J.:

On the 28th of September, 1876, Peter Scoggin was indicted for bigamy in the Circuit Court of Howard County, as follows:

"The Grand Jury of Howard County, in the name, etc., accuse Peter Scoggin of the crime of bigamy, committed as follows, to-wit: That said Peter Scoggin, in the County of Howard, on or about the 15th day of July, A. D. 1868, did unlawfully and feloniously marry one Mary Chandler, and take her to wife, and from the day and year aforesaid, to the finding of this bill of indictment, did and has continued to live and cohabit as man and wife with the aforesaid Mary Chandler, in the County of Howard, he, the said Peter Scoggin, on the aforesaid 15th day of July, A. D. 1868, and ever since that day having a wife living, to-wit: one Sophia Scoggin; to the great injury of the public morals, and contrary to the statute, etc., and against the peace, etc."

The defendent demurred to the indictment on the grounds that it appeared from its face that the offense charged was not capital, and that the indictment was not found, nor any prosecution commenced for the offence, within three years from the date of its commission.

The court overruled the demurrer. The defendant filed a motion to quash the indictment on the same ground, which was also overruled.

Defendant then pleaded not guilty, and was put upon trial.

James Norwood, witness for the State, testified, in substance, that he had known defendant ever since the fall or winter of 1866. Witness moved him to his farm in January, 1867, and defendant lived with him during that year. When the agreement was made for defendant to live with him, witness asked him what family he had, and he said a wife and one child. When he moved to the place of witness, he brought a woman

and one child with him, and he and the woman lived together in the same cabin while he staid there; they cohabited as man and wife. Witness took the woman to be of African descent; she was yellow. In 1875, witness was summoned by defendant as a witness in his behalf, on the hearing of a *habeas corpus* case before Judge Joyner, at Mineral Springs, to prove that defendant and the yellow woman referred to, whom witness called his first wife, were living together as man and wife in February, 1867. It appeared that defendant had taken the child away from his first wife, and she and Joe Weston, her husband at the time of the *habeas corpus* suit, were suing defendant for the child. At the trial before Judge Joyner, defendant swore he and the woman Sophia Weston, were living together as man and wife on the 6th of February, 1867, and that they parted in the fall of that year, and she, Sophia, went off and married Joe Weston; and that about a year after they parted, defendant was married to his present wife, by parson Northam, in Hempstead County, and that he was then living with his present wife, and had lived with her in Hempstead and Howard Counties up to that time. Did not know the name of defendant's second wife, the woman he now lives with.

On cross-examination, witness stated that at the time defendant lived on his place, he and his first wife, Sophia, lived together in one end of a double log cabin, etc. Sophia is a yellow woman and her hair kinky. Thought defendant and Sophia were both negroes; she is a mulatto. Knew nothing of defendant's second marriage, except what he had heard him say.

To the proof of the admissions of defendant to this witness, and of what he swore in the *habeas corpus* case, about his first wife, second marriage, etc., defendant objected, and the court overruled the objection.

R. G. Shaver, witness for the State, testified in substance, that he was an attorney-at-law, and prosecuted the application for *habeas corpus* before Judge Joyner, Judge for the Eight Judicial Circuit, at Mineral Springs, in October, 1875, for Joe Weston and Sophia Weston against defendant, for the custody of Sophia's child. (Here the witness produced the original response of defendant in that case.) That defendant testified as a witness in his own behalf at the hearing of the application, and swore that he was living with Sophia as his wife at the time of the passage of the act of February, 1867, and that he lived with her for eight to ten months after that time, and that he claimed the benefit of said act. He also swore he was married to his second wife some time in 1868, and that he had lived with her to the time of that trial, which was in October, 1875.

The defendant objected to the admission of so much of the testimony of this witness as relates to what he swore on the *habeas corpus* trial about his second marriage, and the court overruled the objection.

Against the objection of the defendant, the court permitted the State to read in evidence his response in the *habeas corpus* case, produced by this witness.

It is subscribed (by his mark) and sworn to 25th October, 1875, before the Clerk of Howard County, and states :

"*First*—That respondent is the lawful father of said infant Elizabeth, who is a minor of about the age of ten years, and as such parent is entitled by law to the custody of the person of said minor until she arrives at the age of majority.

"*Second*—That said infant is the legitimate child of respondent, and said petitioner, Sophia Weston, who has since the birth of said infant intermarried with her co-petitioner, Joseph Weston ; and both said mother and step-father being in indigent circumstances, and unable by reason of their poverty to properly

care for, support and educate said infant, respondent, as in duty bound, has taken upon himself the custody of her person, and her support and education, etc."

The State then offered to introduce the record book of marriage certificates of Sevier County, to prove that defendant and Mary Chandler were married on the 15th July, 1868, as charged in the indictment, which fact was admitted by defendant without proof.

Thereupon it was agreed by the parties (State and defendant), that for the purposes of this case, it might be taken and considered proven to the jury, that defendant and Mary Chandler were married in due form of law in Howard County on the 15th day of July, 1868, and that they have continued to reside and cohabit together as man and wife in said county from that date up to the finding of the indictment herein; and that defendant and Sophia Weston were never lawfully married other than by the force and effect of the act of the General Assembly, approved February 6th, 1867; but defendant objected to said evidence being considered by the jury, or introduced, on the ground that the same was irrelevant, incompetent and inadmissible, because the State had failed to prove a legal former marriage, and because proof of cohabitation with the second wife was irrelevant on a trial for bigamy, the offense being complete without such cohabitation; which objection was overruled by the court, and said evidence, or agreed state of facts, allowed to be introduced, and considered by the jury, etc.

The State offering no further evidence, and the defendant introducing none, the court, at the instance of the State, and against the objection of defendant, instructed the jury as follows.

"*First*—If the jury believe from the evidence, beyond a reasonable doubt, that at the passage of the act of the General Assembly of February 6th, 1867, entitled 'An act to declare the

rights of persons of African descent;' the defendant and one Sophia Scoggin were then cohabiting as husband and wife, and recognized each other as such ; and that afterwards, on the 15th July, 1868, he married one Mary Chandler, and continued to live and cohabit as husband and wife with the said Mary to the date of the finding of the indictment, or to any time within three years prior thereto, and she, the said Sophia, being then and there living, they may find him guilty."

The defendant moved the following instructions, which the court refused :

"*First*—That in indictments for bigamy, the fact of the first marriage is material, and necessary to be proven, in order to support a conviction—and the confession of the defendant, and proof of general reputation and cohabitation are not, in themselves sufficient to prove the marriage, but must be supported by some direct evidence of the fact.

"*Second*—That the legislature cannot, by mere legislative action, create a valid civil contract between two individuals ; and if the jury believe from the evidence that defendant and Sophia Weston, were never married by any officer or person authorized by law to perform the ceremony of marriage, but were simply cohabiting together as man and wife at the time of the passage of the act of the General Assembly, approved February 6th, 1867, they will acquit.

"*Third*—That unless the jury believe from the evidence that the second marriage with Mary Chandler took place within three years next before the finding of the indictment herein, they will acquit."

The jury found the defendant guilty as charged in the indictment, and fixed his punishment at three years imprisonment in the penitentiary. He filed motions for a new trial and in arrest of judgment, which were overruled, and he took a bill of excep-

tions, setting out the evidence, points reserved, and instructions of the court, etc.

He was sentenced in accordance with the verdict, and prayed an appeal, which was allowed by one of the judges of this court.

I.  Passing over, for the present, any question relating to the first marriage, we will consider whether the prosecution for the second marriage was barred by the statute of limitation at the time the indictment was found.

There is no limitation to prosecutions for capital offenses.

No person can be prosecuted, tried and punished for any other felony, unless an indictment be found within three years after the commission of the offense.  Gantt's Dig., secs. 1663–4.

Bigamy is a penitentiary offense (Gantt's Dig., sec. 1316), and a felony.  Id., 1225.

" Every person having a wife or husband living, who shall marry any other person, whether married or single, except in the cases specified in the next section, shall be adjudged guilty of bigamy."  Id., sec. 1312.

"Another felonious offense (says Mr. Blackstone, B. 4, p. 163), with regard to the holy state of matrimony, is what some have corruptly called bigamy, which properly signifies being twice married, but is more justly denominated polygamy, or having a plurality of wives at once.  Such second marriage, living the former husband or wife, is simply void, and a mere nullity, by the Ecclesiastical Law of England; and yet the legislature has thought it just to make it felony, by reason of its being so great a violation of the public economy and decency of a well-ordered State, etc."

"Bigamy, in its proper signification, is said to mean only being twice married, and not having a plurality of wives at once, etc."  1 Rus. on Cr., p. 186, note (a).

It is the marrying, by a person who has a husband or wife living, that constitutes the offense under the statute above copied. In *Patterson* v. *The State*, 2 Iredell Law R., 355, the offender was indicted for bigamy under a similar statute of North Carolina, and on the trial he called the second wife as a witness, and offered to prove by her that his marriage with her had not been consummated by carnal knowledge of her body, and the evidence was rejected. Mr. Justice Gaston, who delivered the opinion of the Supreme Court, on appeal, said: " We hold that the testimony offered was properly rejected, because the fact proposed to be established by it was wholly irrelevant. The crime, in the language of our act, was completed, when ' any person now married, or who shall be hereafter married, doth take to himself or herself another husband or wife, while his or her former wife or husband is still alive;' and there can be no question but that this is done, when the parties, before the authorized minister, declare that they there take each other for man and wife. *Consensus non concubitus facit nuptias.* Marriage, or the relation of husband and wife, is in law complete, when parties, able to contract and willing to contract, actually have contracted to be man and wife in the forms and with the solemnities required by law. It is marriage; it is this contract, which gives to each right or power over the body of the other, and renders a subsequent cohabitation lawful. And it is the abuse of this formal and solemn contract, by entering into it a second time, when a former husband or wife is yet living, which the law forbids, because of its outrage upon public decency, its violation of the public economy, as well as its tendency to cheat one into a surrender of the person under the appearance of right. A man takes a wife lawfully, when the contract is lawfully made. He takes a wife unlawfully, when the contract is unlawfully made, and this unlawful contract the law punishes."

See also 3 Wharton Cr. L. (6th ed.), sec. 2635.

The indictment charged the criminal marriage in this case to have occured on or about the 15th of July, 1868, and it was admitted by appellant, on the trial, that he and Mary Chandler, the second wife, were married in due form of law, on that day. The indictment was found on the 28th of September, 1876, more than three years after the time of the marriage, and hence the prosecution for that offense was barred by the statute of limitations.

The State attempted to avoid the statute bar, however, by alleging in the indictment, and proving, that appellant and Mary Chandler, continued to cohabit together, as husband and wife, from the time of their marriage down to the time of the finding of the indictment, the former wife all the while living.

In some of the states, cohabiting together after the unlawful marriage, is made by statute a distinct offense. Thus in Massachusetts : " If any person, who has a former husband or wife living, shall marry another person, or shall continue to cohabit with such second husband or wife, in this State, he or she shall, except etc., be deemed guilty of the crime of polygamy, etc." 3 Wharton, ch. 9, Bigamy.

*Commonwealth* v. *Bradley*, 2 Cushing, 553, was an indictment for cohabiting after the unlawful marriage under this statute. The first marriage was in New Hampshire, the second and criminal marriage took place in Connecticut, and the indictment, after alleging the two marriages, charged that defendant did cohabit and continue to cohabit with the second wife at Lynn, Massachusetts, for a long space of time, to-wit, for the space of six months, his former wife being then living ; and the indictment was held good.

So in Virginia: "Any person, being married, who during the life of the former husband or wife, shall marry another person in this State, or, if the marriage with such other person take

place out of the State, shall thereafter cohabit with such other person in this State, shall be confined in the penitentiary, etc." 3 Wharton, sec. 2623, Bigamy.

So in Minnesota: "If any person, who has a former husband or wife living, shall marry another person, or shall continue to cohabit with such second husband or wife, he or she shall, except, etc., be deemed guilty of polygamy, etc." *Minnesota* v. *Johnson*, 12 Minn., 476, was an indictment for cohabiting after the unlawful marriage. The indictment charged the first marriage to have occurred in New York, the second in Wisconsin, and the cohabitation with the second wife in Winona County, Minnesota, where the indictment was found. The court held that the defendant could not be punished in Minnesota for a bigamous marriage in Wisconsin, but cohabiting with the unlawful wife in Minnesota was an offense against the statute.

Our statute makes the unlawful marriage a crime, but contains no clause making cohabitation subsequent to the marriage an offense.

The New York statute is similar to ours. 3 Wharton, sec. 2618, Bigamy.

In *People* v. *Mosher*, 2 Parker Cr. R., 195, the prisoner was indicted for bigamy. The facts alleged in the indictment were that he married a wife in Pennsylvania, and lived with her in that State for years, and left her and went to Canada, and then married another woman, his wife still living in Pennsylvania. After his second marriage in Canada, he came to Orleans County, New York, and resided there. The court held that the laws of New York had no extra territorial force, and that the second marriage in Canada was not therefore an offense against the laws of New York; and that although the marriage was void by the law of the place where it was entered into, the subsequent co-habitation of the parties within the State of New York, was

merely an offense against the good morals, but was not indictable as a crime. That the marriage being void, the parties were living together in a state of adultery, which was not recognized as a crime, punishable by indictment under the laws of New York, etc.

Whether the parties in such cases, may be indicted for illegal cohabitation under sec. 1320, Gantt's Dig., we have no occasion to decide in this case, appellant being indicted for bigamy.

II. The demurrer to the indictment, the motion to quash, and the motion in arrest of judgment, were all upon the ground that the date of the criminal marriage, as alleged in the indictment, was not within the period of the statute bar, that is, that it appeared from the face of the indictment that the offense was barred.

Under the former practice, the general rule was that the time alleged in the indictment was not material, unless it was an ingredient of the offense. *Medlock* v. *State*, 18 Ark., 365. But the time should be laid on a day prior to the finding of the indictment, and within the period of limitations, if any was prescribed by law. 1 Wharton Cr. L. (6 ed.), secs. 274–5; 1 Arch. Cr. P. and P., 84–1; 1 Chit. Cr. L., 223; *State* v. *Magrath*, 19 Mo., 678.

By a provision of the Criminal Code:

"The statement in the indictment as to time at which the offense was committed is not material, further than as a statement that it was committed before the time of finding the indictment, except when the time is a material ingredient in the offense." Gantt's Dig., sec. 1787.

Under similar acts, it has been held that the indictment need not allege the offense to have been committed on a day within the period of limitations, though the State must prove it. *Thomp-*

*son* v. *State*, 25 Ala., 45; *Molett* v. *State*, 33 Ala., 411; *State* v. *Stumbo*, 26 Mo., 306; *McGuire* v. *State*, 37 Ala., 162.

III.   As to the first marriage:

The first General Assembly which convened after the close of the civil war, and after the emancipation of slaves, passed acts establishing the civil rights, etc., of persons of color.

By "An act to legalize marriage of persons of color, approved 20th December, 1866, it was provided:"

"That the marriages of all persons of color, who now live together as husband and wife, are hereby declared legal, and their children legitimate."

The second section required magistrates and ministers thereafter solennizing the rites of matrimony between persons of color, to certify their marriages for registration. Acts 1866, p. 52.

By sec. 1, of "An act to declare the rights of persons of African descent," approved February 6th, 1867, it was declared that all persons theretofore known in law this State as slaves or free persons of color, should have the right to make and enforce contracts, to sue and be sued, give evidence, make wills, inherit, purchase and convey real and personal property, and to have equal benefit of the rights of personal security, liberty and property, and of all remedies, etc., enjoyed by white persons, and be subject to the same penal laws, etc.

By sec. 2, all acts to the contrary were repealed, except any statute, etc., respecting marriages of white persons with negroes and mulattoes, etc.

By sec. 3, "That all negroes and mulattoes who are now cohabiting as husband and wife, and recognizing each other as such shall be deemed lawfully married from the passage of this act, and shall be subject to all the obligations, and entitled to all the rights appertaining to the marriage relations; and in all cases,

where such persons now are, or have heretofore been, so cohabiting as husband and wife, and may have offspring recognized by them as their own, such offspring shall be deemed in all respects legitimate, as fully as if born in lawful wedlock."

By sec. 4, future marriages between negroes and mulattoes were to be governed by laws applicable to the whites, but to be registered in separate books.    Acts of 1866-7, p. 98.

The General Assembly of 1866, was composed almost exclusively of Southern men, who were familiar with the habits and usages, and well aware of the limited civil rights, of the colored population during their bondage.

Being an imitative people, they usually observed ceremonies in their marriages such as were customary among the whites, inviting ministers, civil msgistrates, or other persons familiar with such forms, to marry them.    The man and woman, not unfrequently, however, took up with each other, without observing any marriage ceremony, and lived together, and treated each other as husband and wife.

Marriage among them was encouraged by the whites, and respected by humane masters; but the inability of slaves to contract extended to the marriage contract, and hence there was no recognized marriage relation in law between slaves.    Cobb on Slavery, sec. 270.

In Louisiana it has been held that a marriage contract between slaves becomes valid for all purposes after their manumission. *Id. Girod* v. *Louis C. Martin*, 559; See also *Stikes adm'r.*, v. *Swanson et al.*, 44 Ala., 633.

The power of the legislature to legalize their marriages, as it undertook to do by the above acts, does not admit of a well founded doubt.    Cooley Con. Lim., p. 372-3.

It was proven by witness Norwood, that appellant brought the woman, Sophia, to his place as his wife, in January, 1867,

having a child by her, and that they lived together, and cohabited as husband and wife during that year.    It was also proven that he swore in the *habeas corpus* case, that he was living with her as his wife at the time of the passage of the act of February, 6th 1867, and continued to live with her from eight to ten months thereafter, and claimed the benefit of said act.

In his response to the writ of *habeas corpus,* 25th October, 1875, he claimed to be the lawful father of Sophia's child, then ten years old, and that it was legitimate, etc.

The evidence that the parties were cohabiting as husband and wife at the passage of the act legalizing the marriages of colored people, that they continued to live together as husband and wife after its passage, with the solemn admission of appellant that he claimed the benefit of the act, was sufficient proof, on the part of the State, of the first marriage.

In such case the State could not produce the record of the first marriage, there being none; could not, perhaps, have produced a witness who was present at the marriage ceremony, because no ceremony may have been observed.   See *Langtry* v. *State,* 33 Ala., 536; *Haden* v. *Ivey,* 51 Ala., 381; 3 Greenleaf Ev., sec. 204; 5 Wharton Cr. L. (6 ed.) sec 2633, and cases cited in note.

But the prosecution for the bigamous marriage charged in the indictment appearing to be barred by the statute of limitations, the judgment is reversed, and the cause remanded with instructions to the court below to grant appellant a new trial.