# BROWN *v.* CHEATHAM.

## (*Nashville.*  January 9, 1892.)

1. MARRIAGE AND DIVORCE.  *Of slaves.*

   Slave marriages, though never authorized or regulated by statute in this State, have been recognized as valid by the Courts, and the issue thereof declared legitimate, when the marriage was entered into with the master's consent.  And such marriages, once consummated, could not be dissolved by any act of the parties while slaves without like consent of the master.

   Cases cited and approved: Downs *v.* Allen, 10 Lea, 666; Andrews *v.* Page, 3 Heis., 668; 6 Jones (N. C.), 235; 20 Johns., 1.

2. SAME.  *Same.*

   And the parties to such valid slave marriage had not the right, after their emancipation, to annul it and enter into other matrimonial unions; and if they did so the issue of the latter marriage is illegitimate.

3. SAME.  *Same.*

   The Act of 1865-66, Ch. 40, providing that "all free persons of color, who were living together as husband and wife while in a state of slavery, are hereby declared to be man and wife, and their children legitimately entitled to an inheritance" of their parents' estates, applies alone to such slave marriages as had been lawfully entered into.

   Code construed: §3303 (M. & V.); §2447*a* (T. & S.).

---

FROM MAURY.

---

Appeal in error from Chancery Court of Maury County.   A. J. ABERNATHY, Ch.

7—7 P

---

Brown *v.* Cheatham. ·

---

SOUTHALL & SMISER for Brown.

FIGUERS & PADGETT, W. S. FLEMING & SON, and HUGHES & HATCHER for Cheatham.

LURTON, J. This is a bill of ejectment. Complainant claims as heir at law of Addison Denton, colored. Defendants claim that Addison died without heirs at law, and that under § 3272, Code of (M. & V.), the property descended to his widow, Sylvester Denton, from whom they purchased and under whom they claim. The title depends upon the validity of the marriage of Rachel, the mother of complainant, to the intestate, Addison.

Under the statute a jury was called, and issues of fact submitted for their determination. The jury found that the marriage of Rachel to Denton was valid, and that complainant was the sole heir at law of said Denton; and a decree for the recovery of the property was pronounced.

Rachel is shown to have been a slave, and to have so continued until her emancipation in 1865 by the amendments to the Constitution of this State adopted in that year. It does not appear whether Addison was free or slave.

There was evidence tending to show the celebration of a marriage ceremony, by a colored preacher, in 1864, between Rachel and Addison. This was followed by cohabitation, which continued for about a year, when Addison abandoned her, and in April, 1866, contracted another marriage,

under license, with a woman known as Sylvester. Addison and Sylvester lived together as husband and wife until the death of the former in 1878. Defendants claim under conveyance from this woman Sylvester. Either just before or just after the desertion of Rachel by Addison complainant was born. There is evidence tending to show that Addison recognized him as his son. Prior to this short-lived connection with Addison, Rachel is shown to have contracted three other slave marriages. The validity of her marriage to Denton depended chiefly upon the sufficiency of the evidence tending to show the dissolution of these antecedent contracts.

The Court, after telling the jury that our statutes on the subject of marriage and divorce did not relate to or affect the slave population of the State, instructed them as to the dissolution of marriages between slaves as follows: "But as no law was in existence either before or during the war to require slaves to obtain licenses prior to marriage, or authorizing the issuance of such licenses, so there was no law authorizing a divorce of husband and wife who were slaves; and a permanent separation of the parties by a sale of the husband or wife by the master, or by any other act of the parties, either with or without the consent of the master, would amount to divorce as between such slaves; and any other marriage after such permanent separation, entered into by either husband or wife, would be a valid marriage as

between the slaves or under § 3304 of the Code."
This presents the question as to whether a sepa-
ration by a married slave couple without consent
of the owners would be such a dissolution of a
marriage as would make such separated parties
competent to contract a subsequent marriage. It
is true that our statutory marriage and divorce
law has never been regarded as applying to the
slaves held in this State. Yet it by no means
followed that slaves could not enter into *de facto*
marriages to which many of the consequences of
a statutory marriage attached. This subject was
fully and ably considered by this Court in the
great case of *Andrews* v. *Page*, where the opinion
was delivered by Judge Nelson. After reviewing
the history of slavery in this State, and the status
of the slave as a person in the light of the de-
cisions of the Courts of this State, he summed up
the *ante bellum* law upon the subject of slave
marriages in these words: "We hold that a mar-
riage between slaves, with the assent of their
owners, whether contracted in common law form
or celebrated under the statute, always was a valid
marriage in this State, and that the issue of such
marriages were not illegitimates." 3 Heis., 668.
It is true that this holding was not in accord
with the views entertained by the Courts of several
of the Southern States. In many of these it had
been held that slave marriages were null and void.
The ground upon which these cases stood was (1)
that a slave had no such freedom of will as

would enable him to consent to a marriage; (2) that the duties of husband and wife were incompatible with the duties which the slave owed to his master. 1 Bishop on Marriages and Divorces, Section 156 and cases cited.

Judge Pearson, in *Howard* v. *Howard*, thus stated the doctrine as generally held: "Marriage is based upon contract; consequently, the relation of man and wife cannot exist among slaves. It is excluded both on account of their incapacity to contract and of the paramount right of ownership them as property." 6 Jones (N. C.), 235. But, as honstrated by the masterly review of the status of slaves in this State, these objections to slave marriages, growing out of the want of freedom of will and of the paramount duties of the slave to his owner, are altogether obviated when the owners have consented to the marriage. Whenever such consent is shown, either by direct evidence or by facts circumstantially establishing such consent, the marriage of slaves is a valid and legal marriage, and the issue legitimate. In New York and Massachusetts—both having been slave States for more than a century—these legal obstacles to marriage among slaves were removed by legislation. In New York it was by statute declared that slave marriages should be valid, and in Massachusetts an act of assembly provided that "no master shall unreasonably deny marriage to his negro with one of the same nation, any law, usage, or custom to the contrary notwithstanding." *Mar-*

*bletown* v. *Kingston*, 20 Johns., 1; Bishop on Marriage and Divorce, Section 156, who for the Massachusetts legislation cites a note to *Oliver* v. *Sule*, Quincey, 29.

That the consent of the master was essential to the validity of a slave marriage was again announced by this Court in *Downe* v. *Allen*, 10 Lea, 666.

Inasmuch as our divorce laws did not apply to slaves, and inasmuch as the very nature of the institution of slavery made all such marriages subject to the will of the owner, so, for the same reasons, the dissolution of these *de facto* marriages depended likewise upon the will of the owner. Separation of the parties by consent of the owners operated in this State to dissolve the union and render the divorced persons competent to contract a new relation. But the voluntary separation of husband and wife has never been held to operate as a divorce. The consent of the master was as essential to the putting off of the yoke as it was to the putting on. The reasons in the one case are as equally operative in the other, and lie, as we have seen, in the absence of power to consent and in the relation the slave stood toward the owner. The permanent separation of a slave couple by act of the master, though not consented to by the parties—as, when the husband or wife was sold to another State—operated necessarily to dissolve the relation. The temporary separation incident to a limited hiring or due to a temporary exigency,

such as the sending of a slave inside the lines of the Confederate army to prevent his forcible abduction or his running away, and not intended by the owner as a permanent separation, would not operate as a dissolution of a *de facto* marriage. Such a divorce would rest neither upon the consent of the parties nor the owner, and would not be the intended or necessary result of the act of the owner. It was error in the Chancellor to instruct the jury as he did—that a permanent separation by the act of the master, " or by any other act of the parties, either with or without the consent of the master, would amount to a divorce." Such a view of the law would have resulted in wide-spread concubinage, and would have operated to defeat the humane and Christian endeavors of masters to inculcate the obligation of the marriage relation and the duty of virtue. It is not in accord with the decided cases which we have before cited, both of which expressly make the dissolution of the union depend upon the consent of the owner.

The Act of 1866, being §§ 3303, 3304, Code (M. & V.), upon which his Honor laid much stress in his charge, had no other effect than to ratify such slave marriages as had been contracted with the consent of the owners, and which therefore constituted the parties "husband and wife" within the meaning of these sections. The right of inheritance conferred by that Act is dependent upon the existence of such marital relations as were valid

under the law of marriage as applicable to slaves. If married conformably to the usages of slavery, then they constituted the "husband and wife" referred to in the Act of 1866. To construe that Act as making valid every relation of concubinage into which the parties may have entered, and during which they may have lived as *if* husband and wife, would do violence to the well-intended purpose of the law-makers. To construe the Act as operating to set up and restore matrimonial relations theretofore dissolved according to the law of the State affecting slave divorces, would operate to restore the three previous marriages of the woman Rachel, and constitute her a wife with three living husbands.

If the *de facto* relation had been dissolved by consent of the master, or as a necessary result of his act, then the Act of 1866 did not operate to restore the bonds. So, if that Act should be construed as recognizing no distinction between mere meretricious cohabitations and the marriages regularly celebrated by consent of the owner, it would result in rendering many subsequent marriages bigamous, and illegitimate thousands of children who were, under the law as it stood before, the legitimate issue of lawful wedlock.

The Act should be construed as merely ratifying marriages which, as we have seen, were already lawful and legitimate under the law as it stood. In this view of the statute it had no bearing upon this case. If Rachel was competent to marry

Brown *v.* Cheatham.

Denton in 1864, then, independently of that statute, her marriage, if with the consent of her owner, was valid. If she was not competent by reason of a previous marriage, or if her marriage was in defiance of her owner, as it would be if, as there was evidence tending to show, she left her owner as the captive of Denton and fled to the shelter of a Federal garrison, then the Act of 1866 did not validate such invalid marriage.

The case will be reversed and a new trial awarded, when his Honor will charge the jury upon the lines herein indicated.

Complainant will pay the costs of appeal.