| 88 | 721 |
|-----|-----|
| d100 | 262 |

# Richmond.

## SCOTT v. RAUB.

### January 28th, 1892.

1. SLAVE MARRIAGES—*Legitimacy— Case at bar.*—Plaintiff was born in 1862 of parents living together as husband and wife from 1861 to 1864, he being a colored man, and she a slave and dying then, and plaintiff was recognized as his child, and as such reared to womanhood.

HELD:

Under Constitution—Article XI, section 7, and act February 27th, 1866, section 2—she was his legitimate child, and entitled to share by inheritance in his real estate.

2. PARTUS SEQUITUR VENTREM.—Regardless of degree of negro blood, children of slave mothers were likewise slaves. Code, 1860, ch. 103, § 1.

3. SLAVES—*Free negroes.*—Statute prescribing that persons having one-fourth or more negro blood should be deemed mulattoes applies to free negroes, not to slaves. Code, 1860, ch. 103, § 9.

4. IDEM—*Marriage.*—At common law slaves were incapable of contracting valid marriage, but actual marriage had certain moral force, and might be confirmed after emancipation.

Appeal from decree of circuit court of Albemarle county, rendered October 19th, 1889, in a chancery cause, wherein Sarah E. Raub, a woman of color, was complainant, and Robert Scott was defendant. The decree being in favor of complainant, defendant appealed. Opinion states the case.

*Duke & Duke,* for appellant.

*George Perkins* and *Thomas S. Martin,* for appellee.

LACY, J., delivered the opinion of the court.

The case is as follows : Sarah E. Raub, the appellee, a woman of color, filed her bill in the said court against the appellant, Robert Scott, for partition of the real estate which had been held jointly by the defendant and his deceased brother, James Scott, who were the sons of Jesse Scott, deceased. The complainant claimed to be, as the only child of James Scott, deceased, entitled to the undivided one-half of the said land which had belonged to him. But the defendant denied that she was the legitimate child of said James Scott, and entitled to the said land as such, and claimed it all for himself as the sole surviving brother of the said James Scott, deceased.

The facts appeared by depositions to be, that Jesse Scott was the owner of the said real estate, and that his two sons, Robert and James, inherited the same from him. That they had jointly occupied the said land up to the time of the death of James, which occurred in 1888 ; that in 1861 one Ann Settles, a slave woman, was hired as a domestic in the house of James Scott, himself a free person of color, and soon after cohabitation was had between the said freeman and slave woman of color. In 1862 the appellee was born of this intercourse, and in 1864 Ann died, but the child was retained in his house by James, and recognized as his child and reared to womanhood by him, and subsequently married a man named Raub. In 1888 James died intestate.

There is some conflict on the subject, but the evidence tends to show that these people, both James and Ann, had less than one-fourth of negro blood.

The circuit court, at the hearing, held that a common law marriage had been had and solemnized between James and Ann, and that the plaintiff, the issue of the marriage, was capable of inheriting, and so took the father's real estate of which he died intestate, and also that as Ann was a slave, and was recognized by James as his wife, and that as after the death of Ann, and after the passage of the act of February 27, 1866, he recognized the said issue of the marriage, Sarah,

the plaintiff, as his child, she was thus made legitimate, and decreed according to the prayer of the plaintiff's bill. Whereupon the appellant, Scott, applied for and obtained an appeal to this court.

(1) As to the supposed common law marriage between James and Ann; as one of the parties to the alleged contract of marriage was a slave, there could be no such contract entered into.

A slave cannot marry, because he cannot make a valid contract; because the duties of a slave are inconsistent with the duties of a husband or a wife, and because a slave is property. So the marriage of a slave is a mere nullity, though it is allowed a certain moral effect. Amer. and Eng. Encyc. of Law, Vol. XIV, 497, and authorities cited. In *Hall* v. *U. S.*, 92 U. S., 27, 30, it is said: " It was an inflexible rule of the law of African slavery, wherever it existed, that the slave was incapable of entering into any contract, not excepting the contract of marriage." And in *Malinda* v. *Gardner*, 24 Ala. 719, it is said: " The father and mother were slaves, and such persons are incapable of contracting marriage, because that relation brings with it certain duties and rights, with reference to which it is supposed to be entered into. But the duties and rights which are deemed essential to this contract are necessarily incompatible with the nature of slavery."

" A slave, being property, has not the legal capacity to make a contract, and is not entitled to the rights nor subjected to the liabilities incident thereto." *Howard* v. *Howard*, 6 Jones' (N. C.), 235.

(2) But, as has been said, such a marriage is allowed a certain moral force, and may be confirmed after emancipation. In most states there are statutes relating to this subject, which, it is said, was an important one once, but is now no longer important, except as history. *Stikes* v. *Swanson*, 44 Ala. 633; *McReynolds* v. *State*, 5 Cald. 18; *Francis* v. *Francis*, 31 Gratt. 283.

In the Constitution of this state, Art. II, § 7, it is provided that " the children of parents, one or both of whom were

slaves at and during the period of cohabitation, and who were recognized by the father as his children, and whose mother was recognized by such father as his wife, and was cohabited with as such, shall be as capable of inheriting any estate whereof such father may have died seized or possessed as though they were born in lawful wedlock."

And by the second section of the act of February 27th, 1866, it is provided—

" § 2. That when colored persons, before the passage of this act, shall have undertaken and agreed to occupy the relation of husband and wife, and shall be cohabiting together as such at the time of its passage, whether the right of marriage shall have been celebrated between them or not, they shall be deemed husband and wife, and be entitled to the rights and privileges, and subject to the duties and obligations of that relation in like manner as if they had been duly married by law, and all their children shall be deemed legitimate, whether born before or after the passage of this act, and when the parties have ceased to cohabit before the passage of this act in consequence of the death of the woman, or from any other cause, all the children of the woman, recognized by the man to be his shall be deemed legitimate." Acts 1865–'66, p. 85.

This act was construed by this court in the case of *Francis* v. *Francis, supra.* Judge Staples, in that case, in an able opinion, said: " It is insisted that the parties to this suit, although they were colored persons, and living together as man and wife at the time of the passage of the act, are not within the influence of its provisions, inasmuch as they were free before the war, and might have been lawfully married under the laws then in force ; that the sole object of this legislation was to provide a remedy for persons emancipated by the war, who, being slaves, could not legally contract the marriage relation, and who, from want of proper information, even after freedom acquired, might not understand the necessity and propriety of so doing." " The words *include all colored persons,* no matter how or when their freedom was acquired."

" The next question is as to the character of proof requisite to show that the parties are within the statute. It has been very properly said it was not the intention of the legislature to force upon persons the relation of husband and wife against the consent of either. It must appear that they have agreed to occupy that relation. The fact that they have so agreed is, however, not always susceptible of direct proof. The courts must in many cases infer it from the circumstances. It is not necessary that the parties shall have expressly agreed to live together as husband and wife. The agreement or understanding may be implied, as in other cases, from their conduct and declarations." " In the present case," says Judge Staples, " there is no positive proof of an express agreement of the appellant and the appellee to occupy the relation to each other of husband and wife, but the circumstances tending to show an implied understanding of that sort are almost as satisfactory as the direct testimony of unimpeached witnesses to the fact. It appears that they lived together in the house of the appellant as early as the year 1852, and so continued down to the year 1868."

And Judge Wingfield of the Special Court of Appeals of Virginia, in the case of *Colston* v. *Quander*, reported in Vol. I, Va. L. J., p. 689, speaking of the marriage of a free man of color to a slave woman of color in 1842, and construing the effect of the clause adopted April 7th, 1864, in the Alexandria Constitution of the Pierpont Government, as it is called, the said marriage having been solemnized by a minister of the gospel with the consent of the master of the slave, said : " Marriage is a civil contract, and may be entered into by all unmarried persons who have the physical, mental and legal capacity to contract it. Yet, like all other contracts to make the contract of marriage valid, it must be entered into by the mutual consent of parties having the mental and legal capacity to enter into it, and, if this is wanting in either party, the marriage is void, unless ratified by such party after the disa-

bility is removed; but, if so ratified after the competency of the party is attained or restored, the marriage is valid and binding on the parties, and they need not be married again." Citing Bishop on Marriage and Divorce, §§ 55 and 189.

As far back as 1819, the Supreme Court of Louisiana, in the case of *Criod* v. *Lewis*, 6 Martin (O. S.), 559, held, "that while a slave had no legal capacity to assent to a contract, with the consent of their masters they might marry, and had the moral capacity to enter into such a connection. Yet while they remained in a state of slavery, it could produce no civil effect. Emancipation gave to the slave his civil rights, and a contract of marriage valid and legal by the consent of the master, and moral assent of the slave, from the moment of freedom (although dormant during slavery) produced all the effects which result from such contracts among free persons." See, also, *Johnson* v. *Johnson*, 45 Mo. 595; *McReynolds* v. *The State, supra.*

These cases proceed upon the effect of emancipation upon such a contract *proprio regore*, Judge Wingfield resting the question upon the emancipation clause of the constitution in force over the country in which the parties resided, and passing by the act of February 27, 1866, as not needed for his purposes, and making no reference to the eleventh article of the Virginia Constitution, *supra.*

It is clear that under the act of February 27th, 1866, as construed by Judge Staples, speaking for this court, in *Francis* v. *Francis*, and the eleventh article of Virginia Constitution, that the appellee, who was the issue of a slave woman, by a free man, who acknowledged her as his wife, and recognized the issue of the cohabitation as his child after April, 1866, and after the adoption of the constitution was rendered legitimate and capable of inheriting, and did inherit, the land in dispute. The discussion of the degree of colored blood in said appellee is unprofitable. She was a slave, and being a slave, the law (Art. II, sec. 7, Constitution of Virginia) applied to her, and

to her offspring mentioned herein, whether she had three-fourths or any greater amount of white blood.

Her mother was the slave of one Moon, who provided by his will that his slaves should be hired out until one named had been redeemed, as he called it, and enough realized to send them all to a free state; and that, until such amount had been realized to carry out his will in full and fair effect, they should be kept here and hired out. The woman Ann, under our law, as it then was, followed the status of her mother, and was a slave. Ch. 103, secs. 1–17.

The statute relied on by the counsel, sec. 9 of ch. 103 of the Code of 1860, providing that "every person who has one-fourth part or more of negro blood shall be deemed a mulatto, and the word 'negro' in any other section of this or any other statute shall be construed to mean mulatto as well as negro," has no application to any slave, but was intended to apply only to free negroes. The condition of slavery fixed the civil status of any such person as was a slave, and the offspring of the female slave followed the status of the mother, irrespective of any admixture of white blood whatever, and this is apparent by an inspection of the statutes of that Code. Slaves are always referred to as such, and the word "negro" is used only with respect to free negroes.

Sec. 17 of ch. 108, Code of 1860, is as follows: "The court of any county or corporation, upon satisfactory proof by a white person of the fact, may grant to any free person of mixed blood a certificate that he is not a negro, which certificate shall protect such person against the penalties and disabilities to which free negroes are subject as such." By which they became entitled to be tried as white persons; were allowed to give testimony in courts of justice against white persons, &c. *Dean* v. *Commonwealth*, 4 Gratt. 541, where both of these sections were given effect.

Construing the act of February 27th, 1866, in *Francis* v. *Francis*, *supra*, Judge Staples says the law was intended to apply to

all classes of colored persons. These parties were both classed as colored persons, socially speaking, associated with colored persons, attended schools established for colored children, attended and joined a church established and attended by colored persons generally, and the law should be liberally construed. We will consider what was the defect and mischief against which the existing laws did not provide. What remedy has been provided by our law-makers to cure the defect and prevent the mischief, and the true reason of the remedy? It is the duty of the courts at all times to make such construction as should suppress the mischief and advance the remedy. A remedial act should be so construed as most effectually to meet the beneficial end in view, and prevent a failure of the remedy. It is a general rule that a remedial statute should be construed liberally, and a statute made *pro bono publico* should be so construed that it may, as far as possible, attain the end proposed.

The act of February 27, 1866, speaks of *colored persons*, and the act of 1865–'66, ch. 17, sec. 1, p. 84, defines what a colored person is, as follows: "Every person having one-fourth or more of negro blood shall be deemed a colored person."

The Constitution of Virginia, Art. XI, sec. 7, provides for slaves by that name; but it is contended that under our statutes in force at that time, and referred to above, James was not a negro, nor mulatto, but a person of mixed blood, and so in contemplation of law a white man, and that neither James nor Ann were colored persons as defined above, and that the statute of February 27th, 1866, did not, therefore, apply to them, and that the constitutional provision could not apply for the same reason as far as James was affected. But the evidence shows that independent of the slavery of the woman they were socially of the class known as colored persons, and when words are capable of a two-fold construction in statutes, the rule is to adopt such a construction, and such interpretation, *ut res magis valeat quam pereat*, and the words of a statute are to

be taken in their ordinary and familiar signification and import, and regard is to be had to their general and proper use, for *jus et norma loquendi* is governed by usage; and the meaning of words spoken or written ought to be allowed as it constantly has been taken, and we concur with Judge Staples, as expressed in his clear and able opinion, cited above, that this act was intended to apply to all classes of colored persons, and is applicable to the parties here, irrespective of the degree of their color, if they belonged to the class mentioned—to-wit, colored persons—as they evidently did.

Again, there is no clear proof offered, and probably none attainable, as to the degree of colored blood possessed by either; one witness saying the woman had more than one-fourth negro blood, and as to the man that " he was a colored man." I base my opinion upon the privileges he enjoyed; he voted when other colored people voted, and not before; and of the woman, Ann, also that she always passed as a colored person. It never has been questioned. We have not gone into the evidence in detail of the recognition by the husband and father of the wife and child. It is established clearly by entries in the family Bible, made by the husband and father, registering the death of the wife and the birth of the child, and by an unbroken line of conduct, and by plain words as well. We are of opinion that the appellee is, therefore, in legal contemplation, the legitimate child of James Scott, and is entitled, by inheritance, to the real estate in dispute, which was his; and, the decree of the circuit court of Albemarle having so decided, the same is right, and must be affirmed.

DECREE AFFIRMED.