LOUIS ADAMS, J. C. GREELEY AND SAMUEL GAUZE, PLAINTIFFS IN ERROR, VS. PAGE SNEED, NANCY ROSS ALLEN, LUCIEN ROSS, MARGARET ROSS BRONSON AND VIOLET ROSS, A MINOR, BY HER NEXT FRIEND, LUCIEN ROSS, DEFENDANTS IN ERROR.

1. In the absence of enabling statutes, the issue of customary slave marriages, which terminated before, or were never ratified by the parties thereto after emancipation, possess no inheritable blood under our statutes of descent.

2. General emancipation was not retroactive so as to infuse inheritable blood into those who did not possess it before emancipation; nor did it render valid customary slave marriages contracted before, but not ratified or confirmed after emancipation; nor does general emancipation authorize the courts to place the children of customary slave marriages which terminated before, or were never ratified by the parties after, emancipation upon the plane of the legitimate issue of legal marriages, within the meaning of statutes of descent.

3. Children of customary slave marriages which terminated before, or were never ratified by the parties thereto after, emancipation, are neither legitimates or bastards within the meanings of our statutes of descent; they simply have no status one way or the

other. The case of Williams vs. Kimball, 35 Fla. 49, 16 South. Rep. 783, in so far as it holds that such children are placed in the same category as bastards, and that it is proper to give them the benefit of any legislation adding to the inheritable capacity of bastards, *overruled*.

4. Chapter 1566, act approved December 12, 1866, was repealed by sections 4 and 6, Article VIII, and section 1, Article XV, Constitution of 1868, and reenactment of said Chapter as section 1829, Revised Statutes, is in conflict with Article XII, Constitution of 1885, and therefore void. (Taylor, C. J., dissenting.)

Writ of error to the Circuit Court for Duval county.

The facts in the case are stated in the opinion of the court.

*W. B. Owen*, for Plaintiffs in Error.

*A. W. Cockrell & Son*, for Defendants in Error.

CARTER, J.:

On August 23, 1894, Page Sneed instituted in the Circuit Court of Duval county an action of ejectment against Louis Adams seeking to recover title to and possession of a certain parcel of land one hundred and five feet square in block 11 of Brooklyn, in the city of Jacksonville. J. C. Greeley and Samuel Gauze were subsequently made parties defendant upon their application, and the cause was by consent of parties referred to W. B. Young, Esq., referee. Subsequently Nancy Ross Allen, Lucien Ross, Margaret Ross Bronson and Violet Ross, a minor, by her next friend, Lucien Ross, were made parties plaintiff. Greeley and Adams pleaded not guilty and a trial before the referee was had, resulting in a finding and judgment for plaintiffs, from which the defendants sued out this writ of error.

It seems that Gauze and Adams were tenants of Greeley, and claimed no rights in the property other than as such tenants. The record shows that this property formerly belonged to one Miles Price, who conveyed same to August Buesing September 2, 1867. Buesing conveyed to George W. Mitchell March 8, 1869, and Mitchell conveyed to Benjamin Jenkins January 24, 1877. There is evidence tending to show that Jenkins went into possession of the property after his purchase; that he died a bachelor and intestate about May, 1892; that his mother and the mother of Page Sneed were sisters; that Nancy Ross Allen, Lucien Ross, Margaret Ross Bronson and Violet Ross were the children and heirs at law of one Henry Ross, deceased, a brother of Page Sneed. It was agreed between the parties at the trial that "the mother of Page Sneed, the mother of Ben Jenkins and also the mother of these two women were born and lived and died in slavery, and were not married other than according to the customs of slavery times in middle Florida." Greeley claimed title to the land through conveyances from grantees of the heirs of Miles Price. The referee found that the mother of Page Sneed and Henry Ross and the mother of Ben Jenkins were sisters, and slaves and died in slavery, without ever having been married other than according to the customs of slavery in middle Florida; that plaintiffs were the next of kin of Ben Jenkins and were in being at the time of his death; that Jenkins having died without issue or lawful heirs, the title to the lot in question vested in the State, and that by virtue of the act of December 12th, 1866, plaintiffs were entitled to recover it. The referee also found that plaintiffs could not inherit the land in dispute by virtue of the provisions of section 17, act of November 17, 1829, relating to inheritance by and from bastards.

The defendants moved for a new trial upon the ground that the findings and judgment of the referee were contrary to the law and the evidence, and the overruling of this motion constitutes one of the assignments of error relied upon in this court.

As the mother of Page Sneed and Henry Ross, and the mother of Benjamin Jenkins, were born, and lived and died in slavery, it follows that Sneed, Ross and Jenkins were born slaves, as their condition or status followed that of their mothers.   Section 1, p. 216, Duval's Comp.; Section 1, p. 531, Thomp. Dig.   And as these two women and their mother were never married other than according to the customs of slavery in middle Florida, it becomes necessary to determine whether the offspring of customary slave marriages not confirmed after emancipation, possess inheritable blood. This question was before the court in Daniel v. Sams. 17 Fla. 487, and it was held that while there was a moral obligation which natural law imposed in the relation of husband and wife among slaves, still its legal consequences were regulated by the municipal law, and that the issue of a slave marriage, under that law in the absence of enabling statutes, possess no inheritable blood. And this statement of the law accords with all the decisions upon this subject with exceptions presently to be mentioned.   In addition to authorities cited by the court, see Jackson v. Lervey, 5 Cow. 397; Hall v. United States, 92 U. S. 27; McDowell v. Sapp, 39 Ohio St. 558; Scott v. Raub, 88 Va. 721, 14 S. E. Rep. 178; Butler v. Butler, 161 Ill. 451, 44 N. E. Rep. 203.   In Tennessee, contrary to the uniform rulings in other States, customary slave marriages with the master's consent, though never authorized or regulated by statute, were recognized as valid by the courts and the issue are re-

garded as legitimate.    Brown v. Cheatham, 91 Tenn. 97,
17 S. W. Rep. 1033; and in Stikes, Admr. v. Swanson,
44 Ala. 633, it was held that emancipation and elevation
to citizenship gave to children of slave marriages in-
heritable blood; but this decision was overruled in Can-
telou v. Doe, 56 Ala. 519, where it is held that the issue
of customary slave marriages which terminated prior to
emancipation do not possess inheritable blood in the
absence of enabling statutes.    See, also, Washington v.
Washington, 69 Ala. 281.    In 1 Bishop's Marriages, Di-
vorce and Separation, §§670 *et seq.*, the author contends
that children of customary slave marriages were not re-
garded as illegitimates or bastards in slavery, but occu-
pied a status peculiar to that institution; that the aboli-
tion of slavery destroyed this peculiar status, and it
could never again be occupied by any person white or
black; that if the children of slave marriages could not
choose a new status, upon the abolition of slavery, the
law ought to do so for them, and electing for them it
ought to choose that which is most to their advantage,
and therefore select the legitimacy of freedom, rather
than thrust them back and downward to the degradation
of bastardy which was not theirs in slavery.    The Ten-
nessee decisions have not been followed by any other
court so far as we have been able to find, and are based
upon the status of slaves as persons as established by
previous decisions in that State, peculiar to the slave in
Tennessee, and contrary to his status in any other slave
State, and those decisions are not applicable to slave
marriages in Florida.    Nor has the doctrine contended
for by Mr. Bishop been accepted as the law, for while
every person will readily accede to his argument that the
issue of slave marriages were not illegitimate in the
sense of being bastards, that they were the innocent off-

spring of a relation morally and, to a very limited extent, legally regarded as marriage, that with the abolition of slavery all impediments to future legal marriages and to the acquisition of inheritable blood by the issue of such future marriages were swept away, yet in law the children of these marriages did not possess inheritable blood; emancipation was not retroactive, nor could it infuse inheritable blood into those who did not possess it before emancipation, nor render valid slave marriages contracted before but not confirmed after emancipation. It is the province of the legislature to validate void or voidable marriages; to legitimate children, to designate heirs, and to infuse inheritable blood into those who are to inherit the property of decedents, and common law courts have no power to choose the status of legitimacy for or infuse inheritable blood into any person because he may be innocent and deserving, and we find no warrant in the common law which authorizes us to declare that general emancipation requires or authorizes us to place the children of slave marriages which terminated before emancipation upon the plane of the legitimate issue of legal marriages, within the meaning of statutes of descent then in force. Pierre v. Fontenette, 25 La. Ann. 617; Andrews v. Simmons, 68 Miss. 732, 10 South. Rep. 65; Hereford v. Rabb (Miss.), 19 South. Rep. 201; Tucker v. Bellamy, 98 N. C. 31, 4 S. E. Rep. 34; Gregley v. Jackson, 38 Ark. 487. These views are in accordance with the decision in Daniel v. Sams, *supra*, where it was held that there was no law in this State, statutory or otherwise, which gave inheritable blood to the children of customary slave marriages not ratified by the parties thereto after emancipation, and that the legislation of 1866 (Chaps. 1469, 1552, 1566 laws) did not give to such children inheritable blood. There has been no

additional legislation upon this subject applicable to the present case, and it is clear that the plaintiffs can not trace their relationship to Benjamin Jenkins through slave marriages for the purpose of inheriting his estate under our statutes of descent. In Williams v. Kimball, 35 Fla. 49, 16 South. Rep. 783, the plaintiff Williams claimed to inherit certain real estate owned by Dianna Landsbury who was born a slave and died in 1885. Williams claimed to be a brother of Polly Page, the mother of Dianna, and Williams and Polly Page were born slaves of the same slave father and mother. The opinion states that the record did not show whether Williams and Polly Page were the children of a customary slave marriage or some other cohabitation, but that the marriage or cohabitation, which ever it was, terminated before emancipation. Throughout the entire opinion, however, the parties are treated as the issue of a customary slave marriage, and while it was admitted that such children were regarded as standing upon a different plane to those slave children who were bastards pure and simple, and that from a liberal point of view such children were perhaps not bastards, the court held that so far as the want of inheritable blood was concerned, they were placed in the same category as bastards, and that it was proper to give them the benefit of any legislation adding to the inheritable capacity of bastards. The court then proceeds to construe the provisions of section 17, act November 17, 1829, referred to in the finding of the referee in this case, reading "Bastards also, shall be capable of inheriting or of transmitting inheritance on the part of their mother, in like manner as if they had been lawfully begotten of such mother," and concludes that this legislation only makes the bastard legitimate so far as the mother is con-

cerned, and does not make him legitimate so far
as the kindred of the mother is concerned, and
that he can not take by inheritance from col-
lateral kindred upon his mother's side.    Hold-
ing as we do that the children of customary slave mar-
riages are neither legitimates nor bastards within the
meaning of our statutes of descent, it would not be
proper in the present case for us to review this construc-
tion of the bastardy statute, but we may remark in pas-
sing that the construction adopted, while sustained by
some authorities (Allen v. Ramsey's heirs, 1 Metc. (Ky.),
635; Scroggin v. Allen, 2 Dana (Ky.), 363; Croan v.
Phelps' Admr., 94 Ky. 213, 21 S. W. Rep. 874; Bent's
Admr. v. St. Vrain, 30 Mo. 268; Gibson v. McNeely, 11
Ohio St. 131; Hawkins v. Jones, 19 Ohio St. 22; Blair
v. Adams, 59 Fed. Rep. 243; Flora v. Anderson, 75 Fed.
Rep. 217), is repudiated in Virginia and other States
having similar provisions in their rules or descent, and
the court in Williams v. Kimball seems to have over-
looked the fact that our statute of descents embracing
the provision in regard to bastards was adopted from the
statutes of Virginia.    Garland v. Harrison, 8 Leigh (Va.)
368; Hepburn v. Dundas, 13 Grat. (Va.) 219, Ben-
nett  v.  Toler,  15  Grat.  (Va.)  588,  S.  C.  78
Am.   Dec.   638;   Dickinson's   Appeal,   42   Conn.
491, S. C. 19 Am. Rep. 553; Gregley v. Jackson,
Elyton Land Co., 84 Ala. 384, 4 South. Rep. 675; Town
of Burlington v. Fosby, 6 Vt. 83.    But see Bacon v.
McBride, 32 Vt. 585.    But the proposition asserted in
the Williams-Kimball case, to the effect that children of
customary slave marriages, so far as the want of inher-
itable blood is concerned, are placed in the same cate-
gory as bastards, and that it is proper to give them the
benefit of any legislation giving inheritable capacity to
bastards, is incorrect, and we overrule the case to that

extent. The true view is announced in the case of Daniel v. Sams, *supra*, in the following language: "As to these children, however, the status of bastardy, as remarked by Mr. BISHOP, was as foreign to this institution (slavery) as the status of legitimacy. They had no foul or corrupt blood. The simple fact was that they had no status as to this particular one way or the other." If these children were not bastards when slaves, it would be giving to emancipation a remarkable result to hold that freedom reduced them to the degrading status of bastardy. There is no intimation in the Williams-Kimball case, that the court intended to overrule any proposition announced in Daniel v. Sams; on the contrary, the latter case is approvingly cited. In the desire to find some ground upon which to hold that the unfortunate issue of slave marriages could inherit property under our statutes of descent, the court inadvertently applied to them the bastardy statute, though admitting that such issue were not, properly speaking, bastards. To hold that they are bastards not only invests them with a new status, which should properly come from the legislature and not from the courts, but forces upon them a status which humiliates and degrades them unjustly. We think the referee was right in his conclusion that plaintiffs could not inherit the property of Benjamin Jenkins under the bastardy statute.

The plaintiffs, however, base their right to recover upon Chapter 1566, act approved December 12, 1866, which reads as follows:

"Section 1. That whenever, upon the death of any person of color, seized or possessed of real or personal estate there are persons in being who would inherit said property, or any part thereof under the several statutes of descent of this State, but who are prevented from so

doing on account of the legal incapacity of said persons of color to contract marriage in a state of slavery, which said estate would otherwise escheat to the State, all the right, title and interest of the State of Florida is hereby vested in and waived in favor of those persons who would have inherited said estate, if said parties had been competent to contract marriage."

"Sec. 2. That the fact that the said parties shall have failed to obtain a license to marry, or shall have failed to be married according to the forms of law, shall in no case affect the operation of this act, but the same shall be held to apply to all cases wherein the parties were known as husband and wife." While this statute is not referred to in the case of Williams v. Kimball, *supra*, the effect of that decision is to deny its validity. This act is, as its title imports, nothing more nor less than "an act in relation to escheats." A careful reading of the language will show that the legislature did not intend or attempt to validate slave marriages, nor to render legitimate the offspring of such marriages, nor to give them inheritable blood; on the contrary, it expressly recognizes the "legal incapacity of said persons of color to contract marriage in a state of slavery." The only purpose of this statute was to waive in favor of, or grant to, certain admittedly illegitimate persons, all the right, title and interest which the State would acquire by escheat in specified property as to which there should be no lawful heirs capable of inheriting same. This construction of the statute is clearly established by the decision in Daniel v. Sams, *supra*. If this act is still in force, there is plausible ground to hold that the finding of the referee in the present case was correct; but we are clearly of opinion that it was repealed by the constitution of 1868, which provided, among other things,

(section 4, Article VIII) that "the common school fund * * * shall be derived from the following sources: * * * the proceeds of lands or other property which may accrue to the State by escheat or forfeiture;" (section 6, Article VIII) "the principal of the common school fund shall remain sacred and inviolable;" (section 1, Article XV) "that * * * all acts and resolutions of the legislature conflicting or inconsistent with * * * this constitution * * * are hereby declared null and void and of no effect." These provisions of the constitution directing the proceeds of property accruing to the State by escheat to be applied to the common school fund superseded the act of 1866, which undertook to waive the rights of the State in such property in favor of persons not capable of inheriting. We do not mean to intimate that these provisions of the constitution prohibited the legislature from regulating the descent of property, or from validating invalid marriages, or from legitimizing children, or from declaring who should be capable of inheriting the property of deceased persons. The act in question did not attempt to do any of these things, but it did attempt to vest in persons, not lawful heirs of the deceased, the State's right, title and interest in property which would properly escheat and which under the constitution was required to be disposed of for the benefit of the school fund. Under this statute the parties would derive title, not by inheritance from a deceased person, but by grant from the State of its right of escheat. The constitution by prescribing a different course for the disposition of such property repealed the statute. If we concede that this statute was re-enacted by the adoption of the Revised Statutes (section 1829), it may be answered that Article XII of the present constitution of 1885, contains provisions incon-

sistent with the provisions of the re-enactment, to the effect that "the school fund  *  *  *  shall be derived from the following sources:  *  *  *  the proceeds of escheated property or forfeitures;  *  *  *  the principal of the State school fund shall remain sacred and inviolate," and that the re-enactment would therefore be void. Harvey v. Harvey, 25 S. C. 283; State ex rel. Roberts v. Reeder, 5 Neb. 203.

We think the referee erred in finding for the plaintiffs below for reasons stated. The judgment is, therefore, reversed, and a new trial granted.

TAYLOR, C. J., *dissenting.*

I can not agree with the majority of the court in the conclusion reached in this case as to the purpose, intent and legal effect of Chapter 1566 laws, approved December 12th, 1866, nor in the view that said act is in conflict with, or is inconsistent with, section 4, Article VIII, of the constitution of 1868, that assigns to the common school fund the proceeds of all property that may accrue to the State by escheat, and was, therefore, repealed thereby. By the constitution of 1885 the proceeds of all escheated property is also assigned to the common school fund, but, as is admitted in the opinion of the court, I am clearly satisfied that neither of these provisions in the constitution of 1868, nor in that of 1885, can ever be construed to be a limitation upon the power of the legislature to regulate the descent or succession of property. These constitutional provisions mean simply that whatsoever property *may* become *consummatedly escheat* to the State, under the laws as they may exist from time to time, shall, *after the State's title thereto has become complete and absolute*, go into and become a

part of the common school fund; but the legislature is left free and untrammeled to so shape the laws or descent, heirship and inheritance as that it would be almost impossible for any property ever to accrue to the State by escheat. These constitutional provisions were never designed to unalterably fix the status of facts and circumstances by which property should become escheat, but were intended merely to give direction as to what public fund the proceeds of escheated property should go, howsoever and whensoever the State's title thereto has become consummated and absolute through the medium of escheat under the laws upon that subject as they may from time to time be enacted by the legislature, leaving the law-making body free to so alter and change the status of facts and circumstances that will bring property to the condition of being escheat, as that property that would become escheat today under one law would not become escheat tomorrow under an amended law.

The *title* of the act under discussion is "An act in relation to escheats," but no significance can be attached to its title as an index to the purpose of the legislature in its enactment, for the reason that at the time of its passage the legislative department was not under any such constitutional injunction as now exists requiring all bills to be confined to one subject to be expressed in their titles. And to my mind this title is altogether a misnomer, and does not at all express the real leading subject-matter of the act. The act makes use of the word "escheate," it is true, in the body thereof, but nowhere in the act is any provision made whereby any property shall ever become escheat; there is nothing in it that can add a centime to the bulk of property that could or would accrue to the State under the laws that

really deal with, relate to and provide for escheats; neither does it pretend to prescribe the time when, or the circumstances under which, any property shall ever become escheat; in other words, instead of being an act "relating to escheats," it is an act whose every provision shows plainly that its purpose was, not to swell the bulk of the State's gains through escheats, but to give a new direction to property that would, under independent existing law, become escheat but for its enactment, by supplying persons to succeed to its ownership. Instead of providing for escheats its provisions were all designed to prevent escheats, by designating blood kin of the deceased owner of property who should succeed to its ownership instead of the State. It is a settled canon of construction that where the terms of a statute are left doubtful by its language, the judicial interpreter must, if possible, so construe it as to make it effect the purposes for which it was intended; and, in order to determine the scope and object of the enactment, must ascertain what was the mischief or defect for which the law had not provided, and for this purpose he must call to his aid all of those external or cotemporaneously historical facts that are necessary for this purpose and that led to the enactment. Endlich Interpretation of Statutes, §29 *et seq.*, and citations. Another canon of construction equally well settled is that a legislative intent to violate the constitution is never to be assumed, if the language of the statute can be satisfied by a contrary construction. The application of this rule requires that wherever a statute is susceptible of two constructions, of which the one would make it unconstitutional, the other constitutional, the latter must be adopted where it can be without doing violence to the language employed in the act. Endlich Interpretation of Statutes, §178 *et seq.*, and citations. In

the light of these settled rules of construction my view is that this statute, without any violence to its language, may well be construed to be nothing more than a limited statute of descent particularly designating certain blood relations of certain decedents who should succeed to the inheritance and ownership of their propterty, *in the absence of otherwise legetimate heirs.* Resorting to the cotemporaneous history of the time, we find that a large percentage of our population had just emerged from a state of servitude that made them chattel property, into that of freemen. · In their former state, while the institution of marriage between them was recognized as proper from the moral and religious standpoint, yet it was not recognized by the municipal law, and their offspring took no other status than that of property; the law, for the purposes of descent and inheritance between them, did not recognize the relationships that govern the course of descents. From their recently acquired status as freemen it was fair to assume that in future, instead of being owned as property themselves, they would, in the natural course of events, acquire property. The legislature of 1866 found that although the same natural blood relationships existed between them as did between those who had always been freemen, that yet no municipal law had been adopted to apply to them the same rights of succession to property by descent that applied to other citizens. The same legislature enacted another statute giving legal recognition to such slave marriages as continued the marital relationship subsequently to emancipation and up to the adoption of that statute (Chapter 1552, approved December 14, 1866), and legalizing the issue of such marriages. This left a large number of ex-slaves unprovided for who were not legalized by the statute just cited, *because the condition of subsequent*

*ratification of the slave marriages* from which they sprang, made necessary to their legalization by this statute, could not, in the nature of things, ever be complied with, and this for various reasons—the parties to such slave marriages had many of them long since died; others, prior and subsequent to emancipation, had abandoned such relationships and contracted the same relationships with other parties. This statute, misnamed one "relating to escheats," was adopted to provide for that, by no means small, class who were morally as much entitled to the rights of heirship as were the offspring of those who, subsequent to emancipation, continued the marital relationships assumed during slavery.

It can not, I think, be successfully denied that the evident purpose of the legislature in adopting this statute was to give such direction to property that might in future be left by ex-slaves and their descendants who might die intestate, and *without other legalized heirs at law,* as that such property should *vest absolutely in fee* in such of their blood relations as would have been their lawful heirs, according to the laws of descent, had it not been for the disabilities incident to their former state of slavery. This being true, whether there are present in the statute any apt words to *legitimize the blood* of such beneficiaries or not, would not the clear practical operation and effect of the act, if it could have any effect at all, be to make the beneficiaries thereof the successors of their deceased ancestry in the *absolute ownership* of property by them left, and if so, does this not make them, under the conditions of the act, for all practical purposes, the *heirs at law* of such deceased ancestry. The clear attempt of the act is to make them, *according to the rules and directions of the general statute of descents* succeed to the *absolute ownership* of their deceased ances-

try's property. Can anything more be done, practically, by any enactment towards clothing the descendants of deceased ancestry with the character of *legalized heirship*, regardless of the *verbiage* adopted in an act so clearly designed to effect such a result? In my view the act is clumsily worded and as inappropriately titled. Instead of being termed "an act in relation to escheats," a far more appropriate title would have been "an act in relation to descents." By its terms it describes a state of facts with reference to property of certain decedents that, *but for the enactment of its provisions into law*, would, *in future*, bring about the escheat of such property to the State, and then, notwithstanding its enacted provisions, *in advance prevent an escheat by furnishing blood relations to succeed to the ownership instantly upon the future death of the ancestor*, it awkwardly employs language suitable to give expression to the waiver of some *vested* right and to a *grant in presenti* of property already *vested in the State*. I am unable to comprehend how this statute, though it employs language appropriate to a grant by the State in favor of the class of persons named in it, can properly be construed into an unlawful diversion or misappropriation of funds assigned by the constitution of 1868 and 1885 to the common schools. If the title of the State to any property should ever become *consummate* and *vested* through the operation of any existing law *providing for the escheating of property*, then, but only until then, do I admit that any law would be unconstitutional that undertook to give or grant it away to or for any other purpose than that of the common schools, but until the State's title thereto becomes *absolute* the State can constitutionally so legislate as to *prevent escheats in future* by the widest exercise of its powers over the succession and descent of prop-

erty.  This statute can not, I think, be accurately considered as having any of the features of a gift or grant by the State.  Before the State or any other donor can even undertake to give or grant anything it must have same title to or interest in the subject of the grant, inchoate at the least.  In the property of the living citizen the State has no such inchoate title or interest even as that it can make such property the subject of a gift or grant *in presenti* by any law prospective in its operation and contingent upon the happening of some future event, or the concurrence of a set of uncertain and unforseen circumstances.  My judgment is that this statute is in full force and that it can be properly construed in the manner indicated so that it shall not conflict with our organic law.  I am now satisfied that the attempted application in Williams v. Kimball, 35 Fla. 49, 16 South. Rep. 783, of our statute of descents affecting bastards to the issue of slave marriages was altogether erroneous; and had my attention been called, in the consideration of that case, to the case of Garland v. Harrison, 8 Leigh (Va.) 368, I should never have given my consent to the construction put in the Williams-Kimball case upon such bastardy statute of descents, as I am now clearly convinced that the construction put upon the statute by the Virginia courts is the correct one.