RICHARD JOHNSON AND ESSIE JOHNSON, *Plaintiffs in Error,* v. THOMAS WILSON, *Defendant in Error.*

1. Under Chapter 4749, acts of 1899, a child and a grand-child tracing their relationship through a customary slave marriage may take by inheritance the property of their ancestor who died intestate subsequent to emancipation and prior to 1899, where there are no other heirs having a better right.

2. Chapter 4749, acts of 1899, which infuses inheritable blood into the children of customary slave marriages does not violate Article XII, constitution of 1885, which provides that "the school fund shall be derived from the following sources * * * the proceeds of escheated property or forfeitures * * * the principal of the State school fund shall remain sacred and inviolate" even when applied to a case where the ancestor died

prior to its enactment, where the property has never been disposed of or claimed for the benefit of the school fund.

This case was decided by Division B.

Writ of error to the Circuit Court for Columbia county.

The facts in the case are stated in the opinion of the court.

*Roberson & Small* and *M. M. Scarborough, Jr.,* for plaintiffs in error.

*M. C. Jordan* and *John Wallace* for defendant in error.

CARTER, P. J.—This was an action of ejectment instituted by plaintiffs in error against defendant in error in the Circuit Court for Columbia county. The defendant pleaded not guilty, and the cause was referred by consent to a practicing attorney as referee, who found for defendant and entered judgment accordingly, from which this writ of error was taken by the plaintiffs.

The errors assigned are that the referee erred in overruling the motion for a new trial and in entering judgment for defendant.

From the evidence it appears that one Richard Johnson became the owner in fee simple of the property in controversy in 1865, and remained in possesion thereof, residing thereon for several years thereafter. Subsequently he moved to Jacksonville where he died. The exact date of his death does not appear, but it was prior to 1899. He had been a slave, and many years before the civil war he was married according to the customs of slavery, to Sarah, who was also a slave. Sarah died about the time the civil war began. Three children were the issue of this slave marriage, Richard Johnson, the plaintiff, Liddy, the mother of Essie Johnson, the plaintiff, now deceased, and Amerson,

who died intestate without children. Richard and Sarah were married according to the customs of slavery, recognized each other as man and wife and were so recognized until Sarah's death.

The question presented is whether the plaintiffs succeed to the property of the deceased by inheritance. It was held in the case of *Adams v. Sneed,* 41 Fla. 151, 25 South. Rep. 893, and other Florida cases cited therein, that in the absence of enabling statutes the issue of customary slave marriages which terminated before or were never ratified by the parties thereto after emancipation, possess no inheritable blood under our statutes of descent. This decision was rendered at the January term, 1899. The legislature that met the same year, in order to remedy this defect in the law, passed Chapter 4749, entitled "An act to legalize the marriage and offspring of persons of African descent," which reads as follows: "Section 1. That in all cases where persons of African blood have, prior to January first, A. D. 1866, cohabited and lived together as husband and wife, and have, prior to said date, recognized each other before the world, and were recognized as husband and wife, they shall in law be deemed, taken and held to have been lawful husband and wife so long as such relationship existed between them, as fully and effectually for all purposes as if the marriage between them had been solemnized by a proper officer thereto lawfully authorized; and all children, the issue of any such marriage, are hereby legitimized and made heirs of their parents and of their blood relatives generally in the ascending, descending and collateral lines of inheritance according to the general laws of descent in force in this State, as fully as if they had been born in legally recognized wedlock.

Sec. 2. All laws or parts of laws in conflict with the provisions of this act are hereby repealed, and this act shall take effect immediately upon its passage and approval."

The obvious purpose and object of this statute is to make valid customary slave marriages, and to render the

children of such marriages capable of inheriting, and we have no hesitation in holding that such is its effect. It is contended, however, that this statute is essentially the same as section 2068, Rev. Stats. of 1892, and must receive the same construction, *viz*: that it embraces cases only where the parties cohabited together and recognized each other as man and wife and were so recognized by the world after emancipation. That construction was placed upon the act of 1866 from which the section referred to was compiled by the revisers by the decision in *Daniel v. Sams,* 17 Fla. 487, and the subsequent cases of *Williams v. Kimball,* 35 Fla. 49, 16 South. Rep. 783, and *Adams v. Sneed, supra,* do not place a different construction upon it though the revisers made some changes in the verbiage. If the legislature of 1899 intended no change in the law then the act of 1899 is a useless piece of legislation. We feel sure a change was intended, and the act contains language leaving no doubt upon that point. The statute relates to cohabitation as husband and wife prior to January 1st, 1866, and declares that the parties shall in law be deemed, taken and held to *have been* lawful husband and wife *so long as such relationship existed between them.* This language is specially applicable to slave marriages, a relation that could be terminated at the will of the master as well as by death of one of the parties. The legislature had many years before made valid those slave marriages which had been ratified by cohabitation after emancipation, and the statute under consideration bears upon its face in the language we have quoted, unmistakable evidence that its provisions are to be applied to slave marriages during the time that slavery existed, and not to a mere ratification of such a marriage by cohabitation after emancipation which had already been provided for many years before. The effect of the statutes, so far as the present case is concerned, is to enable the plaintiffs to inherit the property of their ancestor. He was never married after emancipation, and left no other children or persons claiming to be heirs, so

far as we are advised. The application of the statute to the present case divests no one of any vested or even of any inchoate right, so far as this record shows. Under these circumstances we fail to see the force of the argument advanced that the statute is unconstitutional because it divests vested rights. As we said in *Adams v. Sneed, supra,* "it is the province of the legislature to validate void or voidable marriages, to legitimate children, to designate heirs and to infuse inheritable blood into those who are to inherit the property of descendants." This power no doubt has its limitations, and the statute in question may possibly, when applied to some cases, transcend such power, but as applied to the present case we see no reason to deny its validity. Its object is a most worthy one. That object is to enable the children of slave marriages to inherit from their ancestors property acquired by the latter in the same manner as the children of marriages entered into by emancipated persons. It would be a reproach to the law if such power were denied. It has been often asserted and as often upheld.

It may be contended, however, that the statute can not be applied in this case where the ancestor died prior to its enactment, for the reason that the property escheated to the State upon the death of the ancestor, and under Art. XII, constitution of 1885, which provides that "the school fund shall be derived from the following sources  *  *  *  the proceeds of escheated property or forfeitures;  *  *  *  the principal of the State school fund shall remain sacred and inviolate," the legislature can not by a retroactive statute divest the right of the State school fund to the proceeds of the property. The provisions quoted were considered in *Adams v. Sneed, supra,* where it was held that section 1829, Rev. Stats. of 1892, contravened them and was, therefore, invalid. But the statute in the present case differs essentially from the one considered in that case. It does not attempt to grant or waive the right of the State in property which would properly escheat, but infuses capacity to inherit in those who would, under the law as it always existed in this

State, have inherited had their ancestors possessed the capacity to contract a marriage recognized by the municipal law. The right of escheat is founded upon the idea that there is no heir to take the property upon the decease of the owner. It may be that children have no natural right to inherit, but the moral considerations are so strong that many people regard the right a natural one. From the earliest history of the State children have been placed first in the line of inheritance, and the act now under consideration does nothing more than extend the same principle to that very large class which was not permitted to trace relationship through slave marriages. It merely removes an impediment to their inheritance as heirs, and where, as here, the property has never been disposed of or even claimed for the benefit of the school fund, we do not see that the constitution is violated in letter or spirit. In *Adams v. Sneed, supra,* we said: "We do not mean to intimate that these provisions of the constitution prohibited the legislature from regulating the descent of property, or from validating invalid marriages or from legitimizing children." The power to validate slave marriages and to enable the children of such marriages to inherit, as was done by this statute, does not, in our opinion, conflict with the provisions of the constitution referred to.

It results from these views that the plaintiffs are the legal heirs of Richard Johnson, deceased, and as the referee held otherwise, the judgment will be reversed and a new trial granted at the cost of defendant in error.

SHACKLEFORD and WHITFIELD, JJ., concur.

TAYLOR, C. J., and HOCKER and COCKRELL, JJ., concur in the opinion.