JOHN G. CHRISTOPHER, *et al.*, *Appellants*, v. JANE MUNGEN, *et al.*, *Appellees*.

1. Partition may be decreed where the parties are shown to be cotenants or coparceners under a legal title.

2. While the statutory proceeding for partition may not be used as a substitute for the action of ejectment to try the title to lands, or used merely for the purpose of establishing rights or titles, yet where the *bona fide* object of a suit is the partition of lands between the common owners thereof, some of whom are complainants and the others are defendants, and some of the parties to the suit are in actual or constructive

33 Vol. 61

possession of the lands, then all controversies between the parties as to the legal title and right of possession may and should be settled by the court, as authorized by the statute, even though some of the joint owners claim adversely under a legal title, or dispute the title or right of the others to possession. And the statute authorizing this to be done in partition proceedings is not violative of the constitutional right to a jury trial.

3. The character and extent or quality of the estate taken by a · Trustee may be determined, not by the circumstance that words of inheritance are used in conferring an estate or power upon a trustee, but by the intent of the parties as shown by the whole instrument creating the trust and defining its purpose and extent.

4. Even though a legal estate be limited in the *habendum* clause of a trust deed to the trustee, his heirs and assigns forever, the estate conveyed is only such as the parties intended should be conveyed as being necessary for the complete execution of the trust as defined and limited in the instrument whose sole purpose was to create the trust.

5. A power to sell lands conferred by a trust deed may be personal to the trustee or it may attach to the office of trustee. If the power is personal to the trustee, it can be exercised by him only; but if the power is incident to the office of trustee, it may be exercised by any one lawfully acting as trustee. Generally a power of sale can be exercised only by the persons to whom it is expressly given.

6. Where real estate is conveyed in trust for particular purposes and the trust fails or is not executed, the real estate will be held by the trustee, or by his heirs for the grantor or his heirs, if the legal estate conveyed to the trustee is of such a nature as to descend to his heirs.

7. To constitute a conversion of real estate into personalty, in the absence of an actual sale, it must be made the duty of the trustee to sell in any event, such conversion resting upon the principle that equity considers that as done which ought to

have .been done. A mere discretionary power to sell produces no such conversion.

8. In determining whether a trustee to whom real estate has been conveyed upon express particular trusts takes a legal estate of inheritance or a less estate in the lands, regard should be had for the estate owned by the grantor, the consideration received, the intent of the parties as shown by the instrument creating the trust, the powers and duties conferred upon the trustee, the purpose and extent of the trust, the personal discretion accorded to the trustee in executing the trust and other matters inherent in the trust, which was the sole purpose designed to be effectuated in executing the trust deed.

9. When a trust deed is in form a bargain and sale of lands to the trustee "as trustee" and the habendum clause is "to have and to hold the same unto the said trustee, his heirs and assigns forever, in trust for the uses, benefits and purposes" particularly stated, specially giving discretionary authority "to sell and convey" the lands for the trust purposes, the trustee will take only such an estate as the grantor intended he should take for the complete execution of all the trusts named, which in effect may be a mere power to convey the fee simple title to the lands in executing the trusts.

10. Where a trust is created to secure the payment of an indebtedness, it is under the statute in effect a mortgage.

11. Where a statute relinquishes the right of the State to property that would descend to persons who would be the heirs of a deceased person if the status of such persons enabled them to be legal heirs, and the legislature otherwise recognizes the right of persons who should be given the status of legitimacy with inheritable qualities, the courts should give full effect to the legislative intent as shown by the terms, subject-matter and purpose of the statute.

12. Enabling statutes designed to establish legal equality among persons where the inferior status of a class is not due to unlawful or immoral conduct on their part should be liberally construed.

13. The children of slave marriages or cohabitations were not in law bastards, but they were generally regarded merely as not having the right of inheritance, their parents not being husband and wife by contract under the law, since as slaves they could not legally contract even in marriage.

14. Enabling statutes designed to give rights of inheritance to the innocent offspring of slave cohabitations that were not forbidden by law, should be liberally construed to carry out the beneficient public policy of the State.

15. It must be assumed that in passing a law the legislature intended a valid enactment rather than one in conflict with the constitution; and statutes should if possible be so construed as to be constitutional rather than as conflicting with organic law.

16. The manifest purpose and reasonable legal effect of Chapter 1566, Laws of Florida, section 2305 of the General Statutes of 1906, were and are not to make disposition of property that had in fact escheated to the State, but the purpose and effect of the act were and are to prevent escheats, and to give such direction to property that might in the future be left by ex-slaves and their descendants who might die intestate, and without other legalized heirs at law, as that such property should vest absolutely in fee in such of their blood relations as would have been their lawful heirs according to the laws of descent, had it not been for the disabilities incident to their former state of slavery.

17. Section 2305 of the General Statutes of 1906 is not in conflict with the constitutional provision that "the proceeds of escheated property" shall become a part of the State School Fund, but it serves a useful purpose in the public policy of the State. The contrary holding in Adams v. Sneed, 41 Fla. 151, 25 South. Rep. 893, disapproved.

18. Where a statute is judically adjudged to be unconstitutional, it will remain inoperative while the decision is maintained; but if the decision is subsequently reversed, the statute will be held to be valid from the date it first became effective, even though rights acquired under particular adjudications where

the statute was held to be invalid, will not be affected by the subsequent decision that the statute is constitutional.

19. Where the holder of the legal title is not made a party in proceedings to foreclose a mortgage upon lands, he is not deprived of his title and rights by a sale of the property under the foreclosure proceedings.

20. Where a court of equity has jurisdiction for the purposes of partition, the court may "proceed to ascertain and adjudicate the rights and interests of the parties" as authorized by the statute.

This case was decided by Division A.

Appealed from the Circuit Court for Duval County.

The facts in the case are stated in the opinion of the court.

*H. H. Buckman, Fleming & Fleming, Stephen E. Foster* and *Baker & Baker,* for Appellants;

*Bryan & Bryan,* for Appellees.

WHITFIELD, C. J.—The appeal was taken from an order overruling a demurrer to a bill for partition.

It appears from the pleadings that James Lewis, a colored person, the owner of certain described lands in Duval county, Florida, on August 5th, 1893, joined by his wife Elizabeth, for a recited consideration of one dollar executed a trust deed covering the lands to William A. McLean, as trustee, to have and to hold unto him and his heirs and assigns forever in trust "to sell and convey the said premises in such lots and subdivisions, and at such time, and upon such terms as in his judgment

may be deemed by said trustee to be for the best interests of all concerned, and from the proceeds thereof to pay and discharge all debts and liabilities existing against me, the said James Lewis, party of the first part. The said trustee is also hereby authorized and empowered to mortgage the whole or any part of the premises hereby conveyed should he deem it best to do so for the purpose of raising and securing means for the payment of expenses incurred and to be incurred in supporting the said parties of the first part, and for the payment of all necessary expenses of every nature and kind whatsoever for the benefit of said parties of the first part, and each of them, and in trust also to convey to such person or persons as the said James Lewis may designate in writing duly signed and witnessed such part of said lands as may be directed by said James Lewis. Any part of said lands not disposed of at the time of the death of said James Lewis is to be sold and conveyed by said trustee at such prices and upon such terms as may be deemed best by him for the use and benefit of Elizabeth Lewis, the wife of the said James Lewis, together with all charges and expenses being first paid in full, and as it will become necessary for said trustee to advance certain sums of money for the benefit of the parties of the first part he is hereby authorized and empowered to reimburse himself from the proceeds of sale of said lands, together with the interest thereon." The trustee accepted the trust but sold none of the land as he was authorized to do before his death in 1898. James Lewis died September 3, 1894, and his wife Elizabeth died about eight months thereafter. No conveyance of the land other than the above stated trust deed was made by James Lewis or his wife; but in 1891, before the execution of the trust deed, James Lewis and his wife Elizabeth executed a mortgage upon a portion of

the property to the Land Mortgage Bank. The mortgage was foreclosed against William A. McLean, Jr., both as administrator of the estate of William A. McLean, the deceased trustee and as trustee for James Lewis and Elizabeth Lewis; and the master's deed under the foreclosure was issued to the Land Mortgage Bank in December, 1900. The heirs of James Lewis were not made parties to the foreclosure proceedings. James Lewis died intestate and left only two children, Jane Mungen and Eliza L. Lewis, who were his offspring in successive cohabitations with two slave women. In 1897 Eliza L. Lewis gave a power of attorney to sell her lands in Duval county, and in February, 1901, the lands in controversy were conveyed under the power of attorney to H. A. Wilson, and subsequently the heirs of Eliza L. Lewis after her death conveyed the lands to said H. A. Wilson whose grantees claim title through Eliza L. Lewis and through conveyances by the administrator and the heirs of William A. McLean, the trustee in the deed of trust executed by James Lewis and his wife Elizabeth. The claims of other defendants will if necessary be stated hereafter in this opinion. Jane Mungen, the complainant, claims an undivided half interest in and seeks partition of the lands owned by her father James Lewis, and concedes that the successors in title to the other daughter Eliza L. Lewis own the other undivided half interest in the land. The complainant offers to do equity by the defendants. The statutes authorize the children of certain cohabitations between colored persons to inherit as heirs.

The demurrers to the bill of complaint raise the questions as to the right of Jane Mungen to have partition of the lands.

The statute authorizes suits in equity for partition of real estate to be brought "by any one or more of several

joint tenants, tenants in common, or coparceners, against their co-tenants, coparceners or others interested in the lands to be divided;" and requires the court to "proceed to ascertain and adjudicate the rights and interests of the parties;" and to "decree that partition be made if it shall appear that the parties are entitled to the same." §§ 1939 *et seq.*, General Statutes of 1906.

Partition may be decreed where the parties are shown to be co-tenants or coparceners under a legal title. While the statutory proceeding for partition may not be used as a substitute for the action of ejectment to try the title to lands, or used merely for the purpose of establishing rights or titles, yet where the *bona fide* object of a suit is the partition of lands between the common owners thereof, some of whom are complainants and the others are defendants, and some of the parties to the suit are in actual or constructive possession of the lands, then all controversies between the parties as to the legal title and right of possession may and should be settled by the court, as authorized by the statute, even though some of the joint owners claim adversely under a legal title, or dispute the title or right of the others to possession. And the statute authorizing this to be done in partition proceedings is not violative of the constitutional right to a jury trial. Camp Phosphate Co. v. Anderson, 48 Fla. 226, 37 South. Rep. 722, 111 Am. St. Rep. 77; Williams v. Clyatt, 53 Fla. 987, 43 South. Rep. 441; Koon v. Koon, 55 Fla. 834, 46 South. Rep. 633; Dallam v. Sanchez, 56 Fla. 779, 47 South. Rep. 871; Williams v. City of St. Petersburg, 57 Fla. 544, 48 South. Rep. 754; Griffith v. Griffith, 59 Fla. 512, 51 South. Rep. 1039; Hobbs v. Frazier, 56 Fla. 796, 47 South. Rep. 929, 20 L. R. A. (N. S.) 105.

The complainant Jane Mungen and the defendants are not coparceners because the latter are not heirs of James

Lewis; and the parties are not joint tenants since they do not claim under the same title and in the same right. But if the facts stated in the bill of complaint and admitted by the demurrers give to the respective parties the rights alleged by the complainant, the parties are tenants in common, and the plaintiff has a right to maintain this suit to have partition made of the lands among the co-tenants.

The character and extent or quality of the estate taken by a trustee may be determined, not by the circumstance that words of inheritance are used in conferring an estate or power upon a trustee, but by the intent of the parties as shown by the whole instrument creating the trust and defining its purpose and extent. Even though a legal estate be limited in the *habendum* clause of a trust deed to the trustee, his heirs and assigns forever, the estate conveyed is only such as the parties intended should be conveyed as being necessary for the complete execution of the trust as defined and limited in the instrument whose sole purpose was to create the trust. See Perry on Trusts, §§ 312, 316, 320.

A power to sell lands conferred by a trust deed may be personal to the trustee or it may attach to the office of trustee. If the power is personal to the trustee, it can be exercised by him only; but if the power is incident to the office of trustee, it may be exercised by anyone lawfully acting as trustee. Generally a power of sale can be exercised only by the persons to whom it is expressly given. Luquire v. Lee, 121 Ga. 624, 49 S. E. Rep. 834; 2 Perry on Trusts § 499.

Where real estate is conveyed in trust for particular purposes and the trust fails or is not executed, the real estate will be held by the trustee, or by his heirs for the grantor or his heirs, if the legal estate conveyed to the

trustee is of such a nature as to descend to his heirs. See Bispham's Prin. in Eqr. § 87.

To constitute a conversion of real estate into personalty, in the absence of an actual sale, it must be made the duty of the trustee to sell in any event, such conversion resting upon the principle that equity considers that as done which ought to have been done. A mere discretionary power to sell produces no such conversion. See White v. Howard, 46 N. Y. 144, text 162 and authorities cited in 2 Words and Phrases, 2437-8.

In determining whether a trustee to whom real estate has been conveyed upon express particular trusts takes a legal estate of inheritance or a less estate in the lands, or a mere power to convey, regard should be had for the estate owned by the grantor, the consideration received, the intent of the parties as shown by the instrument creating the trust, the powers and duties conferred upon the trustee, the purpose and extent of the trust, the personal discretion accorded to the trustee in executing the trust and other matters inherent in the trust, which was the sole purpose designed to be effectuated in executing the trust deed.

Even where, as in this case, the trust deed is in form a bargain and sale of lands to the trustee "as trustee" and the *habendum* clause is "to have and to hold the same unto the said trustee, his heirs and assigns forever, in trust for the uses, benefits and purposes" particularly stated, the trustee will take only such an estate as the grantor intended he should take for the complete execution of all the trusts named. And if the trust conferred personal discretion upon the trustee "to sell and convey" in his discretion for stated trust purposes, and the trustee and all the beneficiaries died before any part of the trust was executed, the purpose of the trust fails and the legal

as well as the equitable title to the land descends to the heirs of the grantor, since the evident intent and purpose of the grantor was not to convey to the trustee an estate of inheritance, but only such a power as was necessary to the complete execution of the trusts.

If the trust deed executed by James Lewis and his wife Elizabeth as parties of the first part to William A. Mc-Lean, as party of the second part, did not convey to Mc-Lean a legal estate of inheritance in the lands that could be lawfully conveyed by his heirs, or such an estate as could be conveyed by his successor in title or power as trustee or otherwise; the title to the lands descended to the heirs of James Lewis who died in 1894. Upon the death of William A. McLean, the trustee, in 1898, after the death of James Lewis' widow in 1895, the title of the heirs was relieved of the trust. The trust deed did not purport to convey to the trustee a beneficial estate for a valuable consideration, but it was merely a declaration of a trust and the grant of a discretionary power to sell and convey or to mortgage the lands. The estate conveyed or the power given as to the lands was only of such a character and to such an extent as was necessary for the execution of the several specific trusts stated in the deed. The discretion given in the execution of the trust was personal to the trustee.

The first trust was "to sell and convey the said premises in such lots and subdivisions, and at such time, and upon such terms as in his judgment may be deemed by said trustee to be for the best interests of all concerned, and from the proceeds thereof to pay and discharge all debts and liabilities existing against me, the said James Lewis." This clearly was a discretionary trust reposed in the trustee McLean personally and could be executed only by him in his life time. As to this feature of the

trust the estate or power ceased at his death, even if a lien for the debts of the grantor remained to be enforced.

The second part of the trust is: "the said trustee is also hereby authorized and empowered to mortgage the whole or any part of the premises hereby conveyed should he deem it best to do so for the purpose of raising and securing means for the payment of expenses incurred and to be incurred in supporting the said parties of the first part, and for the payment of all necessary expenses of every nature and kind whatsoever for the benefit of said parties of the first part, and each of them." This was a personal discretionary trust that had to be performed if at all in the life time of the trustee though a lien for debts remained. A third feature of the trust is "and in trust also to convey to such person or persons as the said James Lewis may designate in writing duly signed and witnessed such part of said lands as may be directed by said James Lewis." This was merely a personal power or trust to be executed by the trustee in his life time. A fourth part of the trust is: "any part of said lands not disposed of at the time of the death of said James Lewis is to be sold and conveyed by said trustee at such prices and upon such terms as may be deemed best by him for the use and benefit of Elizabeth Lewis, the wife of the said James Lewis, together with all charges and expenses being first paid in full." This was a personal discretionary trust and power reposed in the trustee for the use and benefit of the widow of James Lewis who joined in the deed of trust thereby relinquishing her right of dower and in return therefor was to have the use and benefit for her life of such of the lands as remained undisposed of at the death of James Lewis. The final trust was "and as it will become necessary for said trustee to advance certain sums of money for the benefit of the par-

ties of the first part he is hereby authorized and empow-
ered to reimburse himself from the proceeds of sale of
said lands together with the interest thereon." This is a
power of trust coupled with an interest but as its purpose
is to secure the payment of an indebtedness, the instru-
ment as to this part of the trust gave to McLean a lien
and not a title to or an estate in the lands. Connor v.
Connor, 59 Fla. 467, 52 South. Rep. 727. It appears there-
fore that the trust coupled with the interest of the trus-
tee carried no title but merely a lien; and that the other
trusts were personal or discretionary trusts reposed in
the trustee alone, the execution of which it was not con-
templated should be devolved upon another, certainly
after the death of the widow who was the residuary
*cestui que trust,* except in so far as the instrument oper-
ated as a mortgage or subjected the lands to debts of
James Lewis or his wife. The apparent intent of the
parties to the trust deed was to convey only such an
estate or to give such a power as was necessary to the
execution of the specified trusts. As the trusts were not
performed at the death of the trustee, and as before that
time both James Lewis and his wife Elizabeth had died,
the purpose for which the trust was raised failed; and as
there was no intention to convey to the trustee an estate
of inheritance but only to confer a power "to sell and
convey" in fee simple, the title descended to the heirs of
James Lewis at his death; and at the death of the trustee
or upon the failure of the objects of the trusts the title of
the heirs of James Lewis was subject only to such debts
as were made a charge upon the lands by the mortgage
feature of the deed of trust. A mortgage lien is enforced
by the courts.

It is alleged "that the said James Lewis died intestate
leaving him surviving his widow Elizabeth Lewis, who,

as above stated, died about eight months after the death of the said James Lewis, and your oratrix, Jane Mungen and Eliza L. Lewis, his only heir at law. That the said James Lewis was a person of African blood and was the father of your oratrix, Jane Mungen, who was born in slavery. That the said James Lewis, and one Vinie Lewis, the mother of your oratrix, prior to January 1, 1866, cohabited and lived together as husband and wife and prior to said date, recognized each other before the world and were recognized as husband and wife; that the said Vinie Lewis was a person of African blood; that after the death of the said Vinie Lewis, the said James Lewis and one Rhina Lewis prior to January 1, 1866, cohabited and lived together as husband and wife, and prior to said date recognized each other before the world and were recognized as husband and wife, that the said Rhina Lewis was a person of African blood, that your oratrix was the only child of the said James Lewis and the said Vinie Lewis and that Eliza L. Lewis was the only child of the said James Lewis and the said Rhina Lewis."

Taking these allegations to fairly state that James Lewis cohabited with Vinie Lewis, who died a slave after the birth of Jane Mungen, and that subsequently Eliza L. Lewis was born of a cohabitation during slavery between James Lewis and Rhina Lewis, and that such cohabitation ceased before emancipation, then Eliza L. Lewis, the daughter of Rhina Lewis, and Jane Mungen, the daughter of Vinie Lewis, would be heirs under Chapter 4779, Acts of 1899, having equal rights under the statutes of descents with reference to property of James Lewis who was the father of both Jane and Eliza, no superior rights of others appearing.

If the allegation as to the cohabitation of James Lewis and Rhina Lewis and as to Eliza L. Lewis being their only

child, is ambiguous, it should be construed against the complainant, and so construed, it does not clearly indicate that James Lewis and Rhina Lewis did not live together as husband and wife after emancipation, and if they did cohabit as husband and wife after emancipation Chapter 1552, Laws of Florida, approved December 14, 1866, sec. 2068 Rev. Stats. of 1892, would, under former decisions of this court, make Eliza L. Lewis the heir of her father James Lewis at his death in 1894 to the exclusion of Jane Mungen whose mother died in slavery. See also Johnson v. Shepherd, 143 Ala. 225, 39 South. Rep. 223, 5 Ann. Cas. 143 and notes. The statutes of the several States differ materially.

When the status of freemen and citizenship was conferred upon those who had been slaves, it was perhaps not within the province of the courts to perform the apparently legislative function of declaring the existence of inheritable blood in the members and offspring of slave cohabitations that had been recognized as a proper moral relation but not as a legal civil or contract marriage under the State law. But legislative enactments designed to elevate the status of the members and children of proper and mutually recognized slave cohabitations, and to give to them the rights, privileges and responsibilities of legitimate parents and children for purposes of inheritance under the laws of descent, should be so construed as to advance and not to retard the attainment of a legal family status and results commensurate with the rights and duties conferred by the boon of freedom. The right to inherit is controlled by legislative fiat.

Where a statute relinquishes the right of the State to property that would descend to persons who would be the heirs of a deceased person if the status of such persons enabled them to be legal heirs, and the legislature other-

wise recognizes the right of persons who should be given the status of legitimacy with inheritable qualities, the courts should give full effect to the legislative intent as shown by the terms, subject-matter and purpose of the statute.

Enabling statutes designed to establish legal equality among persons where the inferior status of a class is not due to unlawful or immoral conduct on their part should be liberally construed.

The children of slave marriages or cohabitations were not in law bastards, but they were generally regarded merely as not having the right of inheritance, their parents not being husband and wife by contract under the law, since as slaves they could not legally contract even in marriage. This being so, the enabling statutes herein referred to were not designed to legitimatize bastards thereby condoning an offense, but to give rights of inheritance to the innocent offspring of cohabitations not forbidden by law, and such statutes should be liberally construed to carry out the beneficent public policy of the State. The statutes do not apply to immoral relations of persons.

"It is the province of the legislature to validate void and voidable marriages, to legitimate children, to designate heirs and to infuse inheritable blood into those who are to inherit the property of decedents." Adams v. Sneed, 41 Fla. 151, 25 South. Rep. 893. And such enactments do not violate the provisions of the constitution relating to the disposition of escheated property. Johnson v. Wilson, 48 Fla. 76, 37 South. Rep. 179.

The holding in the case of Adams v. Sneed, 41 Fla. 151, 25 South. Rep. 893, that section 1829 of the Revised Statutes of 1892, is in conflict with Article XII of the Constitution of 1885, was not a unanimous decision of the

court.   Immediately after this decision Chapter 4749
Acts of 1899, was enacted; and the doctrine of *stare
decisis* should not be applied.   Postal Tel. Cable Co. v.
Farmville & P. R. Co., 96 Va. 661, 32 S. E. Rep. 468; Bush-
nell v. Dennison, 13 Fla. 77.   If the section can fairly be
so construed as to make it constitutional, it should be
done, especially as it has again been re-enacted as Section
2305 of the General Statutes of 1906.   It must be assumed
that in passing this law, the legislature intended a valid
enactment rather than one in conflict with the constitu-
tion.   Upon mature consideration, it appears that the
section may fairly be so construed as to give it an effect
consistent with organic law.

When James Lewis died in 1894, the following pro-
visions of the Revised Statutes of 1892 were in force:

"Inheritance from persons of color."

"1829.   Who to inherit.—Whenever upon the death of
any person of color seized or possessed of real or personal
estate, there are persons in being who would inherit said
property or any portion thereof under the several statutes
of descent in this State, but who are prevented from so
doing on account of the legal incapacity of said persons
of color to contract marriage in a state of slavery, which
said estate would otherwise escheat to the State, all the
right, title and interest of the State of Florida is hereby
vested in and waived in favor of those persons who would
have inherited said estate, if said parties would have been
competent to contract marriage."

"The fact that the said parties shall have failed to ob-
tain a license to marry, or shall have failed to be married
according to the forms of law, shall in no case affect the

operation of this section, but the same shall be held to apply to all cases wherein the parties were known as husband and wife."

"2068. Certain cohabitation of colored persons legalized.—In all cases where colored persons have resided and lived together as husband and wife, and have before the world recognized each other as husband and wife prior to the fourteenth day of December, 1866, they shall be deemed and taken to be husband and wife, and are so declared to be as fully and lawfully as if the marriage had been solemnized by a proper officer, legally authorized to do and perform the same, and all children born of such parents are legitimate and made heirs of their parents, and capable of inheriting under the laws of this State as if they had been born in lawful wedlock."

Section 1829, as originally enacted is Chapter 1566, approved December 12, 1866, the title being "An Act in Relation to Escheats."

Section 2068, as originally enacted is Chapter 1552, approved December 14, 1866, the title being "An Act Legalizing the Marriage of Persons of Color."

In Daniel v. Sams, 17 Fla. 487, it is said of the second statute above quoted that "the language of the Act is broad enough to cover a slave marriage, but to give it that construction would bring it in conflict with the express language of the Act of December 12, 1866."

If section 2068 is not confined to persons who were cohabiting together after emancipation, or if section 1829 is not unconstitutional, the case of Adams v. Sneed, 41 Fla. 151, 25 South. Rep. 893, should not be followed. The real purpose of section 1829 as shown by its present title and by its terms is not to appropriate escheats, but it is to regulate inheritance from persons of color who had been slaves. Sections 1829 and 2068 of the Revised Statutes of

1892 both relate to the policy of the State to declare rights of inheritance where none existed, and the terms of both statutes are sufficiently comprehensive to include cohabitations that terminated during slavery. They should be so construed as to effectuate the manifest policy and purpose of the legislature.

Chapter 1469, approved January 11, 1866, provided that colored persons living together as husband and wife should within nine months be married if they desired that relation to continue, and that the issue of such prior cohabitation should be legitimated by the act of marriage and thenceforth entitled to all the rights and privileges of legitimate offspring. After nine months from the date of the act such cohabitation without marriage would be a misdemeanor. It is apparent that this statute had proven ineffectual to do justice to the emancipated slaves with reference to their status during slavery and the period just subsequent to emancipation. This was doubtless due to the general lack of acquaintance with the law by the freedmen and their inability to successfully meet the new conditions suddenly thrust upon them. Under these circumstances Chapters 1552 and 1566 were enacted for the purpose of declaring that inheritable blood should exist where it had not before existed, and the manifest intention was to cover all cases where the cohabitation was of the character stated, and existed either before or after the slaves became free persons.

Even if Chapter 1552 afterwards Section 2068 of the Revised Statutes of 1892, did not make the children of slave cohabitations heirs of their parents, Chapter 1556 afterwards Section 1829 of the Revised Statutes of 1892, now Section 2305 of the General Statutes of 1906, did make them such heirs.

The manifest purpose and the reasonable legal effect of

Chapter 1566, Laws of Florida, approved December 12, 1866, Section 1829, Revised Statutes of 1892, now Section 2305 of the General Statutes of 1906, were not to make disposition of property that had in fact escheated to the State, but the purpose and effect of the act were to prevent escheats, and "to give such direction to property that might in the future be left by ex-slaves and their descendants who might die intestate, and without other legalized heirs at law, as that such property should vest absolutely in fee in such of their blood relations as would have been their lawful heirs according to the laws of descent, had it not been for the disabilities incident to their former state of slavery." Adams v. Sneed, 41 Fla. 151, text 166, 25 South. Rep. 893. So interpreted, the statute is not in conflict with the constitutional provision that "the proceeds of escheated property" shall become a part of the State School Fund, but it serves a useful purpose in the public policy of the State, and it should be sustained as such. When Chapter 1566 was enacted, the constitution did not make the title of an act a controlling part of it and did not require the purpose of the act to be correctly expressed in the title. Where a statute is re-enacted in a general revision of the laws an original imperfect title becomes immaterial at least after the re-enactment.

In so far as the cases of Daniel v. Sams, 17 Fla. 487; Williams v. Kimball, 35 Fla. 49, 16 South. Rep. 783; Adams v. Sneed, 41 Fla. 151, 25 South. Rep. 893, conflict with this conclusion they are disapproved.

Where a statute is judicially adjudged to be unconstitutional, it will remain inoperative while the decision is maintained; but if the decision is subsequently reversed, the statute will be held to be valid from the date it first became effective, even though rights acquired under particular adjudications where the statute was held to be

invalid will not be affected by the subsequent decision that the statute is constitutional. See Pierce v. Pierce, 46 Ind. 86.

At the death of James Lewis in 1894, the beneficial interest in the lands descended to his heirs. If he had no heirs it was subject to escheat. When James Lewis died, his wife Elizabeth was living and if he had no children or their descendants, who were his heirs, his wife could have taken his whole beneficial interest in the estate or dower therein at her election, and if she did not elect, she was confined to her dower, which dower right in the lands expired at her death. §§ 1820, 1832 and 1833, Revised Statutes of 1892, §§2295, 2308 and 2309, General Statutes of 1906.

Under Section 1829 of the Revised Statutes of 1892, in force at the death of James Lewis in 1894, his two children Jane Mungen and Eliza L. Lewis were entitled to take their father's property, there being no others having a right to inherit, the surviving widow having only dower rights.

Where the holder of the legal title is not made a party in proceedings to foreclose a mortgage upon lands, he is not deprived of his title and rights by a sale of the property under the foreclosure proceedings. Berlack v. Halle, 22 Fla. 236. The foreclosure of the mortgage given to the Land Mortgage Bank did not affect the rights of Jane Mungen and Eliza L. Lewis, who were not made parties to the foreclosure proceeding.

It is alleged that the defendant William R. Thompson claims to own a portion of the lands by virtue of certain deeds from other parties. There is an allegation that the defendant Bessie A. Martin owns a mortgage executed by H. A. Wilson and Julia A. Wilson on certain of the lands, but that the mortgage can be no lien upon the complain-

ant's interest in the land. Having jurisdiction for purposes of partition, the court may "proceed to ascertain and adjudicate the rights and interests of the parties" as authorized by the statute.

The allegations that the complainant "is seized and possessed of a one-half undivided interest in the property described" and that the defendants either claim or are seized and possessed of the other interests giving the particulars as to such claims and ownership, are sufficient with other allegations to show the complainant's right to maintain the suit against the demurrers, and in view of the statute giving authority to adjudicate the rights and interests of the parties, the allegations do not show multifariousness, and laches do not appear.

The order appealed from is affirmed.

SHACKLEFORD and COCKRELL, J. J., concur;

TAYLOR, HOCKER and PARKHILL, J. J., concur in the opinion.